CANDALAUS CHICAGO, INC., Plaintiff and Counterdefendant-Appellant, *v.* EVANS MILL SUPPLY COMPANY, Defendant and Counterplaintiff-Appellee.

First District (5th Division)    No. 63197

Opinion filed June 10, 1977.—Rehearing denied August 23, 1977.

John Benedek and Norman Crawford, both of Chicago, for appellant.

Chatz, Sugarman & Abrams, of Chicago (Lawrence W. Schueler, of counsel), for appellee.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Candalaus Chicago, Inc. (Candalaus), plaintiff and counterdefendant, filed a complaint against Evans Mill Supply Company (Evans), defendant

and counterplaintiff, alleging nonpayment of $41,306.61[1] for merchandise sold to Evans. In its answer Evans admitted receiving certain merchandise from Candalaus but asserted that the goods received did not conform in quantity or quality to the goods ordered. Evans further counterclaimed against Candalaus, alleging in count I that $2294.95 was due Evans for merchandise sold to Candalaus; in count II that Evans had to replace the nonconforming goods received from Candalaus and also allow discounts to customers for defective goods, and that as a result Evans incurred damages of $31,124; and in count III that through knowledge received in its transactions with Evans, Candalaus maliciously contacted and sold to Evans' customers at "cut rates" the merchandise so rejected by Evans, resulting in damages of $300,000 to Evans in lost sales, profit and good will. In its answer to the counterclaim Candalaus denied the allegations, but asserted that as to count I any amount it might otherwise have owed Evans could be set off against the sum alleged in its complaint against Evans.

After a trial without jury, the trial court dismissed Candalaus' complaint, finding that the sales from Candalaus to Evans as therein alleged constitute an indivisible contract which was materially breached by Candalaus thereby barring recovery. The trial court also dismissed count II of Evans' counterclaim, but entered judgment for Evans against Candalaus on count I for $2294.95, and on count III for $30,000.

Candalaus appeals from the dismissal of its complaint and the judgments entered in favor of Evans on its counterclaim. No appeal has been taken by either party as to count II. The issues presented for review are whether the transactions between Candalaus and Evans constitute an indivisible contract; whether Candalaus made a prima facie showing as to the amount allegedly due; and whether there was sufficient evidence to support the judgment on Evans' counterclaim.

The complaint of Candalaus was tried first, followed by a trial on Evans' counterclaim. The following evidence was adduced in Candalaus' case in chief.

Candalaus is a manufacturer of corrugated paper products which produces to order, among other items, paper products used in the pizza industry. Included are corrugated circles and folders for the delivery of hot pizzas, corrugated boxes called "regular slotted containers," and dividers. Evans is a jobber or distributor who purchased such paper products from Candalaus and sold them to its own customers, some of whom were distributors who in turn resold the merchandise in smaller quantities to pizza restaurants. Evans also sold and delivered certain goods to Candalaus.

Evans started purchasing from Candalaus in 1971. The parties did not

---

[1] The amount alleged due was later amended to $40,755.81.

use written purchase order forms in their transactions with each other. Instead, from time to time, Evans would telephone Candalaus and request that Candalaus manufacture to order and pack for shipping certain quantities of its product of an agreed quality at an agreed price. The goods so produced would then be counted by hand and packed in sealed cases for shipping. In the manufacturing process Candalaus would stamp to order some of the boxes with Evans' name or logo. The cases were then either picked up by Evans or delivered by Candalaus to Evans' warehouse or directly to Evans' customers. As Evans or its customer received goods, it would sign a copy of a shipping invoice; the invoice was later extended by Candalaus, posted to ledger sheets, and then mailed to Evans. Certain dies and printing plates used to stamp the boxes were obtained by Candalaus and billed to Evans along with the manufactured goods.

Candalaus introduced into evidence 75 invoices allegedly representing orders placed by and delivered to Evans between March 3, 1972, and October 17, 1972, for which Candalaus claims $40,755.81 is due and owing. Evans stipulated that 53 of the 75 invoices were orders placed by and delivered to Evans, but regarding these invoices counsel reserved the right to cross-examine as to "conformity." Other invoices were testified to by Rodney Bjerke, Candalaus' comptroller, as indicating whether orders were picked up by or delivered to Evans. The trial court admitted the 75 invoices into evidence as records kept in the regular course of business, expressly stating that at that time it did not pass on the validity of whether Evans received the orders.

Witnesses called by Evans in defense testified at trial that between March 3, 1972, and October 17, 1972, Evans' customers complained to Evans that shipping cartons contained fewer pizza folders than the 50 per carton for which they were billed. They further complained that some folders were crinkled, that folding tabs or "ears" were missing on some folders and/or slots were not cut out, and that when some folders were assembled, the white surface intended for the inside was on the outside and the less desirable brown surface was on the inside. John Taglianetti, sales manager and vice president of Evans, testified that he verified the complaints Evans had received and credit allowances were issued to the customers for short counts and defective goods; further, that when he notified Candalaus of the complaints, Candalaus acknowledged the complaints and promised to make credit adjustments with Evans.

Joel Grossman, president of Evans, testified. In September or October, 1972, one of Evans' customers, Corrugated Processing Co., complained of short counts and defective goods. He verified the complaint and had the cases returned to Evans' warehouse where they were marked with the symbol "X." The cases so marked also bore Evans' name stamped on an

outside panel. He then saw to it that the customer received replacements for the cases taken back to the Evans' warehouse. Grossman further testified that when he notified Candalaus of the incident, Candalaus also inspected the goods and agreed to take them back and issue credit to Evans. Candalaus subsequently picked up the entire shipment consisting of 400 to 500 cases from Evans' warehouse. Corrugated Processing Co. again notified Evans of defective merchandise, and when he returned to the customer's premises to inspect the goods, he saw the cases marked with "X." He inquired of Mr. Norian, president of Candalaus, how the cases got to this customer, and was told that Candalaus had sold the merchandise to Corrugated Processing Co. at a discount, and that he (Norian) would sell to whom he pleased since Evans did not pay its bill.

In rebuttal, Lewis Baughman, president of Corrugated Processing Co., testified on behalf of Candalaus that he had purchased pizza folders from Candalaus in September or October, 1972, but that neither the folders nor their shipping cases bore Evans' name.

Candalaus also introduced into evidence ledger sheets showing that for the period of March 3, 1972, to December 17, 1972, sales to Evans totaled $103,409.41, and that credit other than for cash payment was given to Evans for $11,895.77. Oscar Heldt, Jr., vice president of Candalaus, testified on behalf of Candalaus as to the content of the ledger sheets. During cross-examination of Heldt, counsel for Evans stated that he had "requested pursuant to Rule 216(b) that all records be produced * * * [but] we received no records whatsoever concerning credit memos, concerning anything." Heldt stated that he could not find "those records." Counsel for Evans stated that "in the Notice to Produce, I asked for invoices from Corrugated Processing and all other related matters and I have nothing." The trial court then ordered Candalaus to deliver to Evans originals or copies of all invoices from Candalaus to Corrugated Processing. Candalaus then rested its case in chief.

When trial commenced on the counterclaim, Oscar Heldt, Jr., was recalled, this time by Evans, and testified as follows. He produced at trial and testified with respect to Candalaus' ledger sheets for three accounts: Corrugated Processing Co., Ed's Cheese and Cody Manufacturing. Concerning the trial court's order to produce records, Heldt testified that the 1972 invoices for these three accounts had been destroyed, and that the file on credit memos had been purged after one year. The records had been stored atop the shipping office, and a complaint from the Village Fire Department about storing records there resulted in their destruction. He further testified that in the corrugated paper box industry it is customary for a manufacturer to sell identical goods to a customer and to a customer of its customer.

Edwin E. Grain, chairman of the board of Candalaus and in charge of

its profit-making operation, testified that as a matter of course Candalaus solicited customers of its customers. He testified that the custom in the industry is that manufacturers do not have "exclusive rights nor do brokers do exclusive business in general with one corrugated box company. They generally do business with two or three or four."

John Taglianetti, vice president and sales manager of Evans, testified on behalf of Evans. He observed a shipment of "our product" delivered by Candalaus to Evans; the shipping invoice for these items was addressed to Ed's Cheese, but thereafter the Candalaus driver struck out the name Ed's Cheese. He also testified that items sold by Candalaus to Cody Brothers were of the same type that Evans had been purchasing from Candalaus for resale to Cody Brothers. He further testified as to certain accounts and sales lost by Evans due to complaints about inferior products.

William G. Bailes, vice president in charge of sales for Candalaus in 1972, and at time of trial vice president of Emisco Industries (formerly Evans), testified in part that it was not the custom in the industry for a manufacturer to directly solicit accounts of a broker.

Joel Stone, a certified public accountant and attorney licensed to practice in Illinois, testified on behalf of Evans as to certain documents prepared by him which purportedly reflected various sales and cost figures of Evans. Counsel for Candalaus objected that the reports upon which the documents were based were not in evidence. The trial court stated that it was interested in whether the witness could substantiate a loss of profit due to the conduct of Candalaus, and admitted the documents into evidence noting that it did so "with only such weight as this Court will place on them, which will be very limited."

## I.

The trial court found that Evans' purchases from Candalaus constitute an indivisible contract, and that Candalaus' partial performance thereof "wrought such havoc" in Evans' business so as to preclude Candalaus from any recovery. The evidence clearly shows that during the period of March 3, 1972, to October 17, 1972, some of the goods delivered by Candalaus or picked up by Evans did not conform to what was ordered. The question to be resolved by this court is what effect the nonconforming shipments have upon the obligation of Evans to pay for all goods received during this period.[2]

We would initially note that transactions affecting the sale of goods

[2] We note that Evans' claim for damages due to repacking costs and for recovery of credit adjustments allegedly passed along to its customers for nonconforming goods manufactured by Candalaus is the subject of count II of Evans' counterclaim. This count was dismissed by the trial court as insufficiently proven, and Evans has not appealed the order.

between merchants are treated under article 2 of the Uniform Commercial Code, sections 2—101 through 2—725. (Ill. Rev. Stat. 1971, ch. 26, pars. 2—101 through 2—725 respectively.) Provision is made in section 2—307 of the Code for the sale and delivery of goods in lots, with the apportionment of the price by such lots. Section 2—601 of the Code further outlines a buyer's rights upon improper delivery of goods. The Illinois Code Comment to section 2—601 states that the section "expressly [bases] the buyer's right of acceptance or rejection on commercial units rather than upon the test of divisibility or indivisibility of the contract of sale." (Ill. Ann. Stat., ch. 26, par. 2—601, Illinois Code Comment, at 421 (Smith-Hurd (1963).) A "commercial unit" is defined in section 2—105(6) of the Code as

> "* * * a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole."

The Illinois Code Comment further illustrates that the definition of "commercial unit" may be applied to a situation involving several shipments containing sealed cartons of non-conforming goods, and that such application obviates an indivisible/divisible contract characterization. Ill. Ann. Stat., ch. 26, par. 2—601, Illinois Code Comment, at 422 (Smith-Hurd 1963).

However, it has been stated that the differentiation between indivisible and divisible contracts is limited under the Code, and that where questions arise, pre-Code concepts of indivisibility or divisibility will be applied. (See 67 Am. Jur. 2d *Sales* §156 (1973).) In this respect we note that the Official Comment to the Code provides that even where a buyer accepts non-conforming tender "[he] is not penalized by the loss of any remedy otherwise open to him." (Ill. Ann. Stat., ch. 26, par. 2—601, Uniform Commercial Code Comment, at 422 (Smith-Hurd 1963).) Indeed the parties here argue that whether or not Candalaus may recover the amount claimed due depends upon whether Evans' purchases of goods constitute an indivisible contract or a divisible contract, and they support their contentions with pre-Code authority. We therefore analyze their relationship by applying such pre-Code concepts.

■■ Generally, there cannot be recovery on an indivisible contract for partial performance thereof (*Illingsworth v. Slosson* (1886), 19 Ill. App. 612); however, this rule does not apply to divisible contracts (*Brenton v. Newlin* (1911), 161 Ill. App. 168). (See generally 67 Am. Jur. 2d *Sales* §155 (1973).) Whether a contract is entire or severable cannot be determined

by a precise rule and must depend upon the intention of the parties. (*Keeler v. Clifford* (1897), 165 Ill. 544, 46 N.E. 248; *Keeshin v. Levin* (1975), 31 Ill. App. 3d 790, 334 N.E.2d 898.) Moreover, "[t]he question essentially is one of fact: Did the parties give a single assent to the whole transaction or did they assent separately to several things?" 6 Williston on Contracts §863, at 279-80 (3d ed. Jaeger 1962).

■■ Although a court of review is reluctant to set aside a trial court's finding of fact, we will do so where that finding is contrary to the manifest weight of the evidence. (See *Kenny Construction Co. v. Metropolitan Sanitary Dist.* (1972), 52 Ill. 2d 187, 288 N.E.2d 1.) In the instant case we conclude that the trial court's finding of an indivisible contract is against the manifest weight of the evidence. It is undisputed, and the corporate officers of both parties so testified at trial, that no overall written contract existed between the parties. Evans' status as a customer of Candalaus was based upon telephone orders which were placed from time to time. The orders involved different kinds of goods at differing prices. Moreover, although complaints were made about a particular product (*i.e.*, pizza folders), the evidence shows that the products other than pizza folders were charged to Evans during the relevant period. Under these circumstances we find that the relationship between Candalaus and Evans was comprised of a series of separate agreements, and it follows that Evans is liable for the goods not rejected for which it did not pay. See *Spring v. Slayden-Kirksey Woolen Mills* (1903), 106 Ill. App. 579; *Rothschild Bros. v. Wise* (1899), 81 Ill. App. 95.

## II.

Candalaus claims that it made a prima facie showing that the sum claimed was due and owing since it introduced its invoices into evidence as business records supported by the testimony of its comptroller that the invoices were unpaid. Testimony adduced at trial showed that during the period of March 3, 1972, through October 17, 1972, Candalaus sold goods to Evans totaling $103,409.41. Candalaus claims that Evans still owes $40,755.81 for the goods, as represented by approximately 75 invoices; it further claims that of this amount $19,482.27 is due for non-pizza folder items about which no complaints were made, and $21,275.54 is due for pizza folders about which some complaints were made.

We note that the trial court received the 75 invoices into evidence as records kept in the regular course of business, expressly stating that by so doing it did not pass on the validity of whether Evans actually received the merchandise. We also note that although Evans reserved the right to cross-examine with respect to these invoices as to conformity of the goods, the record discloses that it did not do so and thereby waived cross-

examination thereon. However, testimony adduced at trial showed that some of the goods received did not conform to what had been ordered, and that credit adjustments were contemplated. Indeed Candalaus presented evidence that during the relevant period credit other than for cash payment was given Evans for $11,895.77. Although particularized data was not presented in support of this amount, and Candalaus testified that it was customary for it to purge its file of credit memoranda one year after issuance, Evans presented no evidence that the invoice amounts were not correct or that the credits allowed by Candalaus were in any way inadequate.

We have concluded above that the orders placed by Evans constitute separate agreements, and not an indivisible contract. Insofar as the parties have already presented evidence with respect thereto, we vacate the order of the trial court dismissing Candalaus' complaint and here enter judgment on the complaint in favor of Candalaus and against Evans for $40,755.81.

### III.

■■ Candalaus next contends that the judgment entered in favor of Evans on its counterclaim for goods sold to Candalaus is against the manifest weight of the evidence. In count I of its counterclaim Evans alleged that $2294.95 was due for goods Candalaus had purchased and received. In its answer Candalaus denied the allegations of the counterclaim, but asserted that as to count I any amount otherwise due Evans could be set off against the amount Candalaus claimed due in its complaint.

Both parties submitted pretrial statements to the trial court which have been made part of the record on appeal. Attached to Evans' pretrial statement is a portion of a discovery deposition taken of Rodney Bjerke, Candalaus' comptroller, in which he in substance admitted that the $2294.95 claimed in count I was the amount due Evans, and further stated that Candalaus would not pay the amount since Evans owed Candalaus a greater amount. However, the deposition was not entered into evidence at trial; and as it was not then before the trial court, it would not support a judgment.

Nonetheless, the following statement was made by John Benedek, counsel for Candalaus, during the presentation of proofs in its case in chief.

> "MR. BENEDEK: Mr. Bjerke, do you know whether or not the Plaintiff bought certain goods from the Defendant over the course of business dealings?
>
> MR. SCHUELER [counsel for Evans]: Objection.
>
> MR. BENEDEK: I want to bring out that this doesn't reflect the

sum $2,000 that is owed by the Plaintiff to the Defendant which we admit."

■■ The trial court found that Candalaus had admitted count I of the counterclaim, and entered judgment for Evans for $2294.95. Admissions by counsel of a party on trial supersede all proofs upon the point in question. (*Darling v. Charleston Community Memorial Hospital* (1964), 50 Ill. App. 2d 253, 200 N.E.2d 149, *aff'd on other grounds*, 33 Ill. 2d 326, 211 N.E.2d 253.) A finding of fact of the trial court will not be set aside unless contrary to the manifest weight of the evidence. (*Kenny Construction Co. v. Metropolitan Sanitary District; Santucci Construction Co. v. County of Cook* (1974), 21 Ill. App. 3d 527, 315 N.E.2d 565.) In view of the foregoing, we cannot say that the finding of the trial court of an admission by Candalaus that $2294.95 is due and owing Evans is against the manifest weight of the evidence. Accordingly, we affirm the judgment in this amount in favor of Evans on count I of the counterclaim.

## IV.

In count III of its counterclaim Evans alleged damages of $300,000 for interference with a business relationship. Evans alleged that Candalaus maliciously contacted and sold to Evans' customers the same goods which Candalaus had been selling to Evans for resale to these customers. Evans contended that some of these goods still bore Evans' logo or name. The trial court awarded Evans $30,000 on count III.

Candalaus contends that it was error for the trial court to enter judgment, since the necessary elements of the tort were neither pleaded nor proved.

■■■ The essential elements of the tort of interference with a business relationship are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existing contract; (3) intentional and malicious inducement of the breach; (4) subsequent breach by the third person due to defendant's wrongful conduct; and (5) damages to plaintiff. (*Zamouski v. Gerrard* (1971), 1 Ill. App. 3d 890, 275 N.E.2d 429.) In order to maintain an action for such interference it is necessary to show that defendant interfered maliciously (*Knell v. State Farm Mutual Auto Insurance Co.* (1975), 32 Ill. App. 3d 491, 336 N.E.2d 568), and without lawful cause or justification. (*Loewenthal Securities Co. v. White Paving Co.* (1932), 351 Ill. 285, 184 N.E. 310.) The term "malice" in this regard is not used in its popular sense of ill will or hatred, but in its legal sense as an intent to do wrongful harm and injury and without just cause. *Meadowmoor Dairies v. Milk Wagon Drivers' Union No. 753* (1939), 371 Ill. 377, 21 N.E.2d 308.

The general rule concerning interference with a business relationship is

found in section 766 of the Restatement of Torts, which provides in part:
"§766. GENERAL PRINCIPLE.

\* \* \*, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." Restatement of Torts §766 (1939).

The exception as to privilege is set forth in section 768 of the Restatement of Torts, which provides:
"§768. PRIVILEGE OF COMPETITOR.

(1) One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if

(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

(b) the actor does not employ improper means, and

(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

(d) the actor's purpose is at least in part to advance his interest in his competition with the other.

(2) The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1)." Restatement of Torts §768 (1939).

■■ ■ The right to engage in a lawful business is not absolute, but must be exercised with reasonable regard for the conflicting rights of others. Lawful competition is not actionable even though carried to the extent of ruining a rival. (*Doremus v. Hennessy* (1898), 176 Ill. 608, 54 N.E. 524; see generally 45 Am. Jur. 2d *Interference* §31 (1969); 86 C.J.S. *Torts* §§43 and 44 (1954).) Exploitation of the market should be conducted with the intent at least in part to further one's business; but if pursued solely in spite or ill will and not in the advancement of competitive interest, the conduct is not privileged. *Doremus v. Hennessy.*

In the instant case the evidence showed that Evans was a distributor of paper products manufactured by Candalaus, and that the Evans' customers to whom Candalaus sold were also distributors. Bailes testified for Evans that it was not the custom in the industry for a manufacturer to directly solicit accounts of a broker. On the other hand it was the testimony of Candalaus' corporate officers that it was customary in this industry for a manufacturer to sell to a distributor-customer of its own distributor-customers. Grossman of Evans testified that Evans was not a

broker. No contract bound either party to this suit to buy or sell exclusively to the other.

■■ We find that the evidence demonstrates that Candalaus and Evans were competitors with respect to the distributor-customers. Candalaus' sales to these distributor customers of Evans cannot be said to have been made solely out of spite or ill will, but at least in part to further Candalaus' own business interest. We therefore conclude that malice has not been demonstrated (*Doremus v. Hennessy*), and that the trial court erred in entering judgment in favor of Evans. Accordingly, the judgment entered on count III of Evans' counterclaim is reversed.

## V.

For the above reasons: (1) the order of the trial court dismissing Candalaus' Complaint is vacated and judgment here entered thereon in favor of Candalaus and against Evans for $40,755.81; (2) the judgment on count I of the counterclaim in favor of Evans and against Candalaus for $2294.95 is affirmed; and (3) the judgment on count III of the counterclaim in favor of Evans and against Candalaus is reversed.

Dismissal vacated with judgment here as to complaint; affirmed in part and reversed in part as to counterclaim.

SULLIVAN, P. J., and LORENZ, J., concur.