553 P.2d 1212

**John B. SLATER, Appellant,**

v.

**Frederick D. WESTLAND, Jacqueline H. Westland, and West-Land Development Co., Inc., an Arizona Corporation, Appellees.**

**No. I CA–CIV 2847.**

Court of Appeals of Arizona,
Division 1,
Department C.

July 13, 1976.

Rehearing Denied Aug. 10, 1976.

Petition for Review Denied Sept. 21, 1976.

Lewis & Roca by Joseph E. McGarry, Gerald K. Smith, Richard N. Goldsmith, Phoenix, for appellant.

Jennings, Strouss & Salmon by Thomas J. Trimble, John E. Burger, Phoenix, for appellees.

## OPINION

HAIRE, Chief Judge, Division 1.

This appeal presents questions concerning the effect of a termination notice given by the appellee landowners (Westlands) pursuant to the provisions of a land development agreement entered into between the landowners and the appellant real estate agent (Slater). The subject of the land development agreement was some 240 acres owned by the Westlands and situated in Maricopa County, Arizona, and in general the agreement's terms obligated Slater "to serve as developer of and to do all work necessary to supervise the development of such part or all of the [subject] real estate as the parties may agree into salable mobile home lots."

Paragraph 3 of the agreement provided for payment to Slater of a share of the net profits and a monthly draw as follows:

"Westland shall pay to Slater Five Hundred Dollars ($500.00) per month as a draw to apply against Slater's twenty-five per cent (25%) of the net profits of

the development. The net profits of the development of the land will be determined as of the end of each calendar year and Westland will pay Slater's portion thereof less the sum of all prior draws which have not previously been charged against a prior distribution of Slater's portion of the net profits to Slater promptly after such determination has been made. Under no circumstances shall Slater be required to repay to Westland in cash any money paid to him as a draw. In the event of the termination of this agreement under Paragraph 7 hereof or of a sale of real estate under Paragraph 9 hereof, the net profits of the development for the year in which any such event occurs shall be determined to the date of such occurrence and payment of Slater's share, less the sum of all prior draws which have not previously been charged against a prior distribution of Slater's portion of the net profits, shall be made to him in addition to the amounts provided in Paragraphs 7 and 9 hereof."

At the time the agreement was entered into, 80 of the 240 acres were actually in the process of being developed as a mobile home subdivision. As to duration, the agreement provided that it would:

". . . unless terminated as hereinafter provided, continue for the time necessary to develop and sell the above-described 240 acres of real estate."

The termination notice which we have referred to above was given by the landowners on November 20, 1972, some 19 months after the agreement was entered into. The termination notice was given pursuant to paragraph 6 of the agreement, which provides:

"6. This agreement may be terminated by the mutual consent of the parties. *It may also be terminated, at Westland's option, at any time after Slater's monthly draws which have not been charged against Slater's share of the net profits exceed $6,000.00* or in the event of Slater's failure to perform his duties here-

under or of Slater's death or of Slater's physical or mental disability. Westland shall exercise his option to terminate this agreement by notifying Slater or his guardian or personal representative to that effect. Such notice shall be in writing and shall be considered to have been given when mailed, postage prepaid, to Slater at his last known residence address or such notice may be given in person." (Emphasis added).

It is undisputed that at the time of the giving of the termination notice, Slater's monthly draws not charged against his share of the net profits totaled $10,500, thereby exceeding the $6,000 figure set forth in paragraph 6.

Paragraph 7 of the agreement sets forth the parties' rights and obligations in the event of a termination, as follows:

"7. In the event of the termination of this agreement, as provided in Paragraph 6, Westland shall promptly pay to Slater the amount of the principal and interest then due on any loan from Slater to Westland. Westland shall also promptly pay to Slater any amount due Slater under Paragraph 3 hereof, and in addition shall pay Slater Twenty Thousand Dollars ($20,000.00) less the total amount of all draws previously paid to Slater which have not been offset against development profits. Such payments shall be accepted by Slater as payment in full under this agreement and thereafter Slater shall have no claim against Westland for any other sums whatsoever except such sums as may have been specifically agreed upon in a separate writing signed by Westland and Slater."

It was the Westlands' position that paragraph 6 gave them the right to terminate; that under the provisions of paragraph 7 which required them to pay "any amount due Slater under paragraph 3 hereof," nothing was due since there had been no net profits, and that therefore their obligation under paragraph 7 was to pay Slater $20,000 less $10,500 (the total amount of all draws previously paid which had not

been offset against development profits), leaving a balance of $9,500 due Slater.

After the termination, Slater filed suit against the Westlands, and the first count of his complaint involved the claim which is the subject of this apppeal.[1] In opposition to a motion for summary judgment filed by the Westlands, Slater filed an affidavit showing that at the time of the termination, he had performed most of the development services required of him with respect to development of the initial 80 acre subdivision. The only unfinished items in the 80 acre subdivision were the installation of several street signs already on order and the hook-up of some of the gaslights that had been placed throughout the subdivision. The latter item had already been requested of the gas utility company. It is undisputed that at that time only 7 of the 80 lots had been sold. It was Slater's contention that the portion of the parties' agreement relating to the development of the 80 acres was severable from that pertaining to the balance of the 240 acres; and that therefore at the time of the termination he had already earned and was entitled to receive for his work 25% of the net profits, not as computed as of the time of termination on November 20, 1972, but rather as computed when the 80 lots are sold. The trial judge rejected Slater's contention, and entered summary judgment for the Westlands on Count I.

■ We have reviewed the various decisions cited by Slater on the issue of severability, but fail to see their relevance in view of the very express provisions of the parties' agreement under consideration. Ordinarily, the important respect in which a divisible or severable contract differs from other contracts is that the performance of each severable part by one party is the agreed exchange for a corresponding part by the other party. Restatement of Contracts, § 266(3); 17 Am.Jur.2d, Contracts, § 324. Here it is apparently Sla-

ter's contention that his performance of his development responsibilities relating to the 80 acres brought into existence at that time an obligation on the Westlands' part to pay him 25% of any net profits which might be earned in the future from sales relating to said 80 acres, and that any right of termination remaining in the Westlands pursuant to paragraph 6 could only be effective insofar as concerns future development of other portions of the 240 acres. Such a construction of the Westlands' obligations does great violence to the clear and unambiguous language of the parties' agreement.

It is clear from paragraph 1 that, although the development plans for the balance of the 240 acres were indefinite, the parties intended that the agreement would continue for the time necessary to develop and sell the entire 240 acres, "unless terminated as hereinafter provided." By the terms of paragraph 3, the Westlands were obligated to pay Slater a draw of $500 per month to be applied against Slater's future share of the net profits, with Slater having no obligation to repay these draws in the event future profits failed to materialize. However, the Westlands were not left completely unprotected against this continuing liability in the event net profits were slow in materializing. By the provisions of paragraph 6, they were given the right to terminate the agreement at any time Slater's monthly draws not previously charged against net profits exceeded $6,000. But if they chose to so terminate, the agreement itself required the payment of (1) "any amount due Slater under paragraph 3", plus (3) an additional $20,000. From this amount the outstanding draws were to be subtracted, leaving a net amount due Slater. In order to adopt Slater's contentions and find that at the time of the termination the Westlands were obligated to pay Slater profits to be earned from future sales of lots from the 80 acre subdivision, we would have to ignore the

---

1. Slater's complaint also involved a claim concerning the simultaneous termination by the Westlands of an exclusive listing agreement.

No questions concerning that claim are involved in this appeal.

express provisions of paragraph 3 detailing how net profits were to be determined in the event of a termination, as follows:

"In the event of the termination of this agreement under Paragraph 7 hereof or of a sale of real estate under Paragraph 9 hereof, the net profits of the development for the year in which any such event occurs shall be determined *to the date of such occurrence* and payment of Slater's share, less the sum of all prior draws which have not previously been charged against a prior distribution of Slater's portion of the net profits, shall be made to him in addition to the amounts provided in Paragraphs 7 and 9 hereof." (Emphasis added).

In obvious recognition of the weakness of his position, Slater sought through his affidavit to introduce parol evidence to establish that the language of paragraph 6, which in turn brings into play the provisions of paragraphs 3 and 7, was never intended to allow a termination of the agreement, but rather was intended only to provide a method of terminating his draws under the agreement. The trial judge correctly refused to consider this parol evidence. The initial determination of whether an agreement is ambiguous, and thus subject to interpretation through the use of parol evidence, is a question of law to be determined by the court. *Kintner v. Wolfe*, 102 Ariz. 164, 426 P.2d 798 (1967); *Grossman v. Hatley*, 21 Ariz.App. 581, 522 P.2d 46 (1974). Here, the provisions of the contract could not have been more clearly drafted. When the agreement is considered as a whole, it is internally consistent, and clearly and unambiguously sets forth the rights of the parties. The trial judge correctly rejected Slater's severability and related arguments inasmuch as they were an attempt to overturn the express provisions of the parties' agreement relating to the obligations undertaken by the Westlands.

A secondary issue raised by Slater is the contention that the Westlands' accountant utilized improper accounting standards and procedures in determining "net profits". Insofar as Slater contends that the accountant improperly utilized the date of November 20, 1972, as the appropriate date for the determination of net profits, this is but an extension of Slater's severability argument which we have rejected above. Further argument relating to the accountant's choice between differing accounting theories in the determination of net profits is immaterial, since even under the theory urged by Slater, no net profits would have been earned as of November 20, 1972, and therefore the result would not have been changed in any way.

In summary, we hold that the agreement of the parties provided an unambiguous procedure for termination and applicable standards for determining the parties' monetary rights in the event of such a termination, and the trial judge did not err in granting the defendants summary judgment on Count I of Slater's complaint.

The judgment is affirmed.

EUBANK, P. J., Department C, and NELSON, J., concur.