598 P.2d 116

WATSON CONSTRUCTION COMPANY, a Minnesota Corporation, Appellant,

v.

REPPEL STEEL & SUPPLY COMPANY, INC., an Arizona Corporation, Appellee.

No. 1 CA–CIV 3744.

Court of Appeals of Arizona, Division 1, Department A.

June 12, 1979.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P. C., by Jeffrey B. Smith, Phoenix, for appellant.

Jennings, Strouss & Salmon by Frederick J. Martone and William F. Haug, Phoenix, for appellee.

## OPINION

HAIRE, Judge.

The basic issue on this appeal is whether a general contractor is liable to its subcontractor for breach of contract when the underlying construction project is terminated prior to its completion. The action in the trial court originated when Amfac Mortgage Corporation filed its complaint in foreclosure after construction had stopped on what was intended to be a regional shopping center in Tempe, Arizona. Although numerous other claims and parties were involved in the trial court proceedings the questions on this appeal concern only the general contractor, Watson Construction Co., and its steel subcontractor, Reppel

Steel & Supply Co., Inc. Both Watson and Reppel were defendants in the foreclosure proceedings because they had filed lien claims against the subject real property. Defendant Reppel filed a cross-claim against defendant Watson for damages for breach of three separate subcontracts relating to the furnishing and erection of steel for the project. After considerable discovery, the trial court granted summary judgment in Reppel's favor and against the general contractor in the amount of $1,714,846.59.

On appeal from that summary judgment Watson contends that because of specific provisions in the subcontracts, it never became liable to Reppel, but that in any event, even if it became liable, there were genuine issues of material fact relating to the question of damages which precluded summary judgment.

Considering first the issue of liability, Watson contends that the subcontractor had no right to receive payment from the general contractor unless and until the general contractor had received payment from the owner.[1] The essence of this argument is that the subcontractor agreed to look exclusively to such fund for payment, and that the existence of such fund therefore became a condition precedent to liability on the part of the general contractor to the subcontractor.

The provisions of the subcontracts that Watson relies upon in support of its condition-precedent argument are as follows:

"THE CONTRACTOR AGREES AS FOLLOWS:

\* \* \* \* \* \*

"C. . . . to pay the Sub-Contractor, promptly upon receipt thereof from the Owner, the amount received by the Contractor on account of the Sub-Contractor's work to the extent of the Sub-Contractor's interest therein. . . .

"D. . . . At all times subcontractor shall be paid to the extent that the contractor has been paid on his account."

1. Here, at least for summary judgment purposes, the parties agree that the general con-

Reppel urges that the above-quoted provisions of the subcontracts do not create a condition precedent conditioning the general contractor's obligations so as to limit Reppel's right of recovery to a fund created by the owner's payment to the general contractor. Rather, Reppel urges, the subcontract agreements created fixed obligations with the quoted provisions merely providing a convenient or normal time for payment. We agree that the trial court correctly resolved this issue in favor of Reppel.

As a general rule conditions precedent are not favored and the courts are not inclined to construe a contractual provision as a condition precedent unless such construction is plainly and unambiguously required by the language of the contract. *See Minthorne v. Seeburg Corp.,* 397 F.2d 237 (9th Cir. 1968), *cert. denied* 397 U.S. 1036, 90 S.Ct. 1357, 25 L.Ed.2d 647 (1970); Restatement of Contracts § 261 (1932). Although we have not found any case involving contractual language identical to that contained in the subcontracts before this Court, we have reviewed several decisions involving similar provisions, and the majority hold, as a matter of law, that no condition precedent limiting recovery to a specific fund is created by provisions of this nature.

The Arizona decision most squarely in point is *Darrell T. Stuart Contractor of Arizona v. J. A. Bridges & Rust-Proofing, Inc.,* 2 Ariz.App. 63, 406 P.2d 413 (1965). That decision involved an action by a sub-subcontractor to recover the balance claimed due from a subcontractor under an assumption agreement. The sub-subcontractor had agreed to perform work that the subcontractor had originally contracted to perform. The subcontract contained the following provision:

"The contractor shall pay the subcontractor's pay estimate (less ten percent (10%) retainage within ten days after receipt of payment by the contractor and as allowed by the Government. The 10%

tractor had not received such payment from the owner.

retainage shall be paid to the subcontractor upon completion of all work required of the contractor, and final acceptance and payment by the government."

2 Ariz.App. at 64, 406 P.2d at 414.

In addition, the assumption agreement provided:

"5. *Payments* to be made to the sub-sub-contractor (assumption agreement) *'shall be made within ten (10) days after receipt of payments by Darell T. Stuart Contractor of Arizona* from Dale Benz, Inc.,—J. W. Wells—B. H. Oates under the subcontract marked Exhibit "A" and attached hereto.' "

2 Ariz.App. at 64, 406 P.2d at 414 (Emphasis added).

The sole issue was whether the above-quoted paragraph 5 constituted a condition precedent which barred the plaintiff's recovery until 10 days after receipt of payment by the defendant subcontractor from the general contractor. The Court held that the plaintiffs had not agreed to look to a specific fund from which, and only from which, payment was to be made, and quoted extensively from a leading decision in this area, *Thomas J. Dyer Co. v. Bishop International Engineering Co.,* 303 F.2d 655 (6th Cir. 1962), as follows:

"It is, of course, basic in the construction business for the general contractor on a construction project of any magnitude to expect to be paid in full by the owner for the labor and material he puts into the project. * * * The solvency of the owner is a credit risk necessarily incurred by the general contractor, * *. This expectation and intention of being paid is even more pronounced in the case of a subcontractor whose contract is with the general contractor, not with the owner. * * * he is primarily interested in the solvency of the general contractor with whom he has contracted. He looks to him for payment. Normally and legally, the insolvency of the owner will not defeat the claim of the subcontractor against the general contractor. Accordingly, in order to transfer this normal credit risk incurred by the general con-

tractor from the general contractor to the subcontractor, *the contract* between the general contractor and subcontractor *should contain an express condition clearly showing that to be the intention of the parties."*

*Darrell T. Stuart Contractor of Arizona, supra,* 2 Ariz.App. at 65, 406 P.2d at 415 (Emphasis in original; citations omitted).

Accordingly, since the contract before the court did not contain an express condition clearly and unambiguously showing that the intent was to create a condition precedent, judgment for the plaintiff was affirmed.

An example of a contract that does clearly and unambiguously show an intention to create a condition precedent is found in *Campisano v. Phillips,* 26 Ariz.App. 174, 547 P.2d 26 (1976). There an architect settled a dispute concerning nonpayment of his fees by entering into an agreement which provided that he was to be paid $15,000 "out of the first draw of the construction . . . loan", and $5,000 "out of the last draw from said . . . construction loan." The settlement agreement contained an additional provision that the "mode of payment as set out [above] shall be the method of payment and the only method of payment for the [architect's] work . . .." No construction draws were ever paid, and, accordingly, the architect was not paid. He sued for payment contending that he was entitled to be paid within a reasonable time, and that the receipt of construction draws was not a condition precedent to his right to be paid. The trial court entered judgment against him, and on appeal, the court stated:

"Our own research has disclosed the case of *Kirchoff v. Cummard,* 26 Ariz. 512, 226 P. 1092 (1924), which construed a contract using the words 'out of' not to limit payment to a particular fund. The court stated:

' . . . the [trial] court evidently concluded that by the term "provided, said payment be made," it was the intention of the parties to provide that the commission should be paid within a year, and out of the $7,500 if this in-

stallment should be received by appellant, but in case it was not, out of some other fund. There was ample evidence to support this view and full justification for the conclusion drawn therefrom by the court that in the absence from the contract of the word "exclusively," or "only," or some other expression having the effect of showing that the commission was payable from this fund and no other, the contract merely limited the time beyond which appellee was not required to wait for his commission.' 26 Ariz. at 520–21, 226 P. at 1094."

*Campisano v. Phillips, supra.* 26 Ariz. App. at 177, 547 P.2d at 29.

The court in *Campisano* then noted that the provisions in the architect's agreement were not limited to the "out of" language discussed in *Kirchoff,* but in addition provided that payment out of construction loan draws was to be the "only" method of payment. This was held to clearly create a condition precedent to liability, satisfying the *Kirchoff* standard that required a showing by the use of expressions such as "exclusively" or "only" demonstrating not only an intent that payment was to be made from a specified fund, but also that payment was to be made from that particular fund *and no other.*

Recognizing its burden, Watson relies upon the language of paragraph D of the subcontracts which stated that "At all times subcontractor shall be paid to the extent that the contractor has been paid on his account." Watson contends that this "at all times" provision is somehow equivalent to the "only" language contained in the *Campisano* agreement. We disagree. While the "at all times" provision certainly gives rights to Reppel in the sense of assuring Reppel that at all times it will be paid to the extent that payment has been made to Watson and that such funds will not be diverted by Watson to other purposes, the converse is not true. The provision does

not in any manner state that Reppel's right to payment is limited to the fund created by the owner's payments to Watson, and only to that fund.

Watson next argues that in any event the provisions of the subcontract agreements were ambiguous as to whether the parties intended to create a condition precedent, and that the resolution of this ambiguity involves a material issue of fact which precludes the entry of summary judgment. The question of whether a contract is ambiguous is initially a question of law for the court to decide. *Slater v. Westland,* 27 Ariz.App. 227, 553 P.2d 1212 (1976); *Ash v. Egar,* 25 Ariz.App. 72, 541 P.2d 398 (1975). As we have previously noted in this opinion, the legal standard is that provisions such as those found in the subcontracts in question do not create a condition precedent in the absence of additional language which clearly shows that the payments were to be made "exclusively" or "only" from the specified fund and no other. Applying this standard, we find no language in the subcontract agreements clearly showing an intent that payment was to be made exclusively or only from funds paid by or on behalf of the owner to Watson. We find no ambiguity, and therefore hold that parol testimony would not have been admissible to establish a material issue of fact as to the proper interpretation of the agreements.[2]

Although there is some authority to the contrary, our holding that the subject contractual provisions are not ambiguous and do not create a condition precedent is in accord with the majority of decisions which we have discovered from other jurisdictions considering similar provisions. *See Thomas J. Dyer Co. v. Bishop International Engineering Co.,* 303 F.2d 655 (6th Cir. 1962) (summary judgment for the subcontractor affirmed); *Atlantic States Construction Co. v. Drumond & Co.,* 251 Md. 77, 246 A.2d 251

**2.** Watson attempts to establish an ambiguity through the affidavit of its president. However, the affidavit merely states in a conclusory fashion the alleged intent of the parties, and

does not set forth such facts as would be admissible in evidence as required by Rule 56(e), Arizona Rules of Civil Procedure.

(1968) (summary judgment for subcontractor affirmed); *Howard-Green Electric Co. v. Chaney & James Construction Co.,* 12 N.C.App. 63, 182 S.E.2d 601 (1971) (summary judgment for subcontractor affirmed); *Mignot v. Parkhill,* 237 Or. 450, 391 P.2d 755 (1964) (judgment on the pleadings for the general contractor reversed); *Yamanishi v. Bleily & Collishaw, Inc.,* 29 Cal.App.3d 457, 105 Cal.Rptr. 580 (1972) (reversed for entry of judgment in favor of subcontractor); *Byler v. Great American Insurance Co.,* 395 F.2d 273 (10th Cir. 1968) (trial court's interpretation as a condition precedent reversed); *A. J. Wolfe Co. v. Baltimore Contractors, Inc.,* 355 Mass. 361, 244 N.E.2d 717 (1969) (judgment for subcontractor affirmed); *Midland Engineering Co. v. John A. Hall Construction Co.,* 398 F.Supp. 981 (N.D.Ind.1975) (judgment entered in favor of subcontractor); *Wisznia v. Wilcox,* 438 S.W.2d 874 (Tex.Civ.App.1969) (not a condition precedent, judgment affirmed); *Schuler-Haas Electric Corp. v. Aetna Casualty & Surety Co.,* 49 A.D.2d 60, 371 N.Y.S.2d 207 (App.Div.1975), *affirmed,* 40 N.Y.2d 883, 389 N.Y.S.2d 348, 357 N.E.2d 1003 (1976) (subcontractor entitled to summary judgment). *Contra Riley Construction Co., Inc. v. Schillmoeller & Krofl Co.,* 70 Wis.2d 900, 236 N.W.2d 195 (1975) (provisions ambiguous, therefore summary judgment not appropriate); *Mascioni v. I. B. Miller, Inc.,* 261 N.Y. 1, 184 N.E. 473 (1933) (provisions ambiguous, judgment for general contractor affirmed); *Mathews Corporation v. Tutten Enterprises, Inc.,* 343 So.2d 902 (Fla.App. 1977) (summary judgment for subcontractor reversed); *Jerome Distributors, Inc. v. BLI Construction Co., Inc.,* 142 Ga.App. 776, 237 S.E.2d 13 (1977) (in accord with prior Georgia appeals decisions, provisions create conditions precedent); *E. W. Hoffman, Inc. v. Aetna Casualty & Surety Co.,* 48 A.D.2d 695, 368 N.Y.S.2d 48 (1975) (summary judgment for subcontractor reversed).

Watson urges that many, if not all, of the authorities supporting Reppel's liability theory on this appeal concern fact situations in which performance by the subcontractor has been completed, and thus the sole question before the court is the subcontractor's suit for the balance of the contract price. In our opinion, while such a distinction obviously would be very material insofar as concerns proof of the damages incurred, it is immaterial on the basic liability issue.

■ Since we reject Watson's contention that the subject contractual provisions constituted conditions precedent to its liability, we hold that the trial judge correctly found Watson liable to Reppel for breach of the three steel subcontracts. This conclusion is based upon the fact that Watson admits that it stopped all work on the Tempe Mall project on November 19, 1974, thereby clearly preventing further performance by Reppel of its subcontracts.[3] In arriving at this conclusion we have considered and rejected Watson's contention that there are material issues of fact affecting liability relating to Reppel's ability or inability to complete the steel erection within one hundred calendar days after August 13, 1974, as required in that part of the subcontracts denominated as Change Order No. 1. Under the facts presented in the record before this Court, any factual issues as to whether Reppel could have completed the steel erection within the schedule set forth in Change Order No. 1 are not material. Watson has not advised either the trial judge or this Court of any facts indicating that delay (if such be the case) by Reppel played any part in creating the difficulties that led to the demise of this construction project. To the contrary, as between Watson and Reppel, the record is clear that the failure of Reppel to complete its performance by proceeding with the steel erection was occasioned, in the final analysis, by Watson's abandonment and stopping of all work on the project.

With liability established, we now proceed to consider Watson's contention that, even if liability is assumed, the entry of summary judgment was inappropriate because of the existence of material issues of fact concerning the damages sustained by Reppel. In this connection we note that no

---

**3.** There is some indication in the record that because of nonpayment by Watson, Reppel actually stopped work on November 7, 1974. We simply note that without question a complete breach by Watson had occurred by November 19, 1974.

contention has been raised on appeal that the legal theory of damages urged by Reppel and applied by the trial court was erroneous. Therefore, for the purposes of this appeal, we consider only Watson's contentions relating to factual issues without any intent to indicate this Court's approval or disapproval of the standard employed. We do, however, find it necessary to briefly outline the overall damages concept advanced by Reppel, in order that the materiality of the various factual issues alleged by Watson might be appropriately examined.

Reppel's basic approach to proving its damages was to show how much expense it had incurred to the time of breach in performance of the subcontracts, including basically the purchase price of the steel and other materials, labor and various other expenses, and a rather substantial item for overhead, all totalling $1,519,683.41. ("Schedule of Costs and Expenses", Exhibit D to Motion for Partial Summary Judgment). To this total Reppel added an amount representing its estimate of what it would have cost Reppel to complete performance of the subcontract, $436,440.00. ("Schedule of Costs to Complete", Exhibit E–1 to the Motion for Partial Summary Judgment).[4] This brought the total to $1,956,123.41. Under Reppel's theory this total represents what it would have cost Reppel to fully perform the subcontracts.[5] Reppel then computed the profit it would have made by subtracting this total cost figure ($1,956,123.41) from the total contract price, $2,151,287.00.[6] This profit of

$195,163.59 was then added to the amount representing Reppel's claimed expense actually incurred in performance, $1,519,683.41 (Exhibit D, discussed above) for a total damage figure of $1,714,846.59, which is the amount of the judgment entered by the trial court.

■ On appeal Watson has raised numerous questions concerning alleged issues of material fact relating to the amount of damages awarded to Reppel, which Watson contends made the entry of summary judgment improper. Since in our opinion the matter must be reversed and remanded for trial to determine the appropriate amount of damages, we need not discuss each of these questions, but rather will focus on what we consider to be one of the major shortcomings in Reppel's proof presented in the trial court.[7]

A major component involved in Reppel's computation of its expenses allegedly actually incurred (Exhibit D to Motion for Partial Summary Judgment), and in its schedule of estimated costs to complete was an item for "overhead".[8] When Reppel initially filed its motion for summary judgment, most of its factual allegations were in conclusory form and were not set forth in evidentiary detail nor supported by affidavits that would satisfy the form requirements imposed by Rule 56(e), Arizona Rules of Civil Procedure. These defects were pointed out in the responses to the motion, and Reppel attached to its reply additional affidavits and other evidentiary detail in an attempt to clear the Rule 56(e) hurdle.

---

4. Included within the estimated costs to complete were amounts for shop labor, painting, grouting, trucking expense, erection, and again a substantial sum for overhead.

5. In our discussion of both liability and damages in this opinion, we use the term "subcontracts" as including not only the three basic subcontracts, but also the three change orders which together formed the basis of Reppel's total claim in this litigation.

6. Because of disagreement between the parties relating to the amount which would be due to Reppel under Change Order No. 1, there is some dispute as to the accuracy of this total contract price. In view of our finding, hereinafter set forth, that for other reasons the judgment must be reversed as to damages, we leave

the resolution of this factual dispute to subsequent trial court proceedings.

7. We acknowledge that some of the damage issues raised by Watson on appeal were not raised in the trial court, and thus are not properly urged on appeal. *Jennings v. Roberts Scott & Co., Inc.,* 113 Ariz. 57, 546 P.2d 343 (1976); *Pool v. Peil,* 22 Ariz.App. 417, 528 P.2d 168 (1974).

8. The expense allotted for overhead in the "Schedule of Costs and Expenses" already incurred was $239,565.01 for preparation of structural steel, and $8,500.00 for preparation of rebar steel. On the "Schedule of Costs to Complete" the claimed overhead expense was $89,600.00.

However, not all defects were cured. One of the problems urged in the responses in the trial court went to the complete lack of evidentiary foundation for the "Schedule of Costs to Complete", including in particular the foundational deficiencies for the claimed "overhead" expense contained in the schedule of costs to complete as well as in the claimed expenses already incurred. The only explanation in the record for these overhead claims was that the structural steel overhead resulted from the application of a factor of 20%, and the rebar steel overhead from a factor of 17.198%. We find no foundation in the record for the utilization of these factors nor any explanation for the inconsistencies pointed out by Watson that result from the application thereof and comparison with the schedules relied upon by Reppel.

Numerous other defects, inconsistencies and conclusory allegations in the factual record presented to the trial court were relied upon by Watson as demonstrating the impropriety of determining the issue of damages in a summary judgment context. Certainly in the interest of economy for both the litigant and the judicial system, the disposition of legal disputes in a trial court action is well served by the utilization of the summary judgment process in accordance with the policies set forth in Rule 56, Ariz.R.Civ.P. However, that process is designed for the settling of *legal* disputes only. Much has been written in our case law emphasizing that where, upon the material facts presented in the summary judgment proceedings, there are facial conflicts or a possibility that conflicting inferences might be drawn by a trier of fact therefrom, summary judgment is inappropriate. Here, many of the material facts relating to the damages issues were presented in conclusory form and without a showing of adequate foundation in violation of Rule 56(e). Although some of these inadequacies were cured by Reppel's reply filed in the trial court, in our opinion there remain substantial factual issues for resolution in a setting other than that envisioned by our summary judgment procedures.

We therefore affirm the trial court's judgment on the liability issues, and reverse and remand for further proceedings for the ascertainment of damages. In such further proceedings, all issues relating to damages which are not necessarily precluded by our holdings as to liability in this opinion shall be open for further consideration and disposition by the trial court. We do expressly note for the trial court's guidance that our affirmance as to liability necessarily includes a rejection by this Court of the issues sought to be raised by Watson relating to the furnishing of "mill" or "warehouse" steel and going to the pricing interpretations of the provisions of the basic subcontracts. We hold that the parties subsequently resolved, and therefore made immaterial, any differences they might have originally had on these issues by entering into Change Order No. 1. *See, e. g.,* Restatement (Second) of Contracts § 241 (Tent. Drafts Nos. 1–7, 1973); *Tonn v. Philco Corp.,* 241 A.2d 442 (D.C.App.1968); *Custom Built Homes v. Kansas State Commission of Revenue & Taxation,* 184 Kan. 31, 334 P.2d 808 (1959); *Commerce Trust Co. v. Howard,* 429 S.W.2d 702 (Mo.1968).

DONOFRIO and FROEB, JJ., concur.