696 P.2d 1330

**AUTONUMERICS, INC., a New York corporation, Plaintiff-Appellee,**

v.

**BAYER INDUSTRIES, INC., an Arizona corporation, Defendant-Appellant.**

**No. 1 CA–CIV 6327.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 4, 1984.

Reconsideration Denied Nov. 23, 1985.

Review Denied Feb. 5, 1985.

William F. Behrens, Phoenix, for defendant-appellant.

Murphy & Posner by K. Bellamy Brown, Phoenix, for plaintiff-appellee.

OPINION

JACOBSON, Chief Judge.

The issues in this appeal are (1) whether the parties entered into an "installment contract" as defined in A.R.S. § 47–2612(A) *, (2) whether the trial court's instructions and evidentiary rulings on the measure of damages were correct and (3) whether prejudgment interest was properly awarded.

Autonumerics, Inc. (Autonumerics) filed a complaint on April 28, 1977 for breach of contract against Bayer Industries, Inc. (Bayer); Bayer filed an answer and counterclaim for breach of warranties. The trial court granted Autonumerics' second motion for partial summary judgment on the issue of Bayer's liability for breach of contract. The counterclaim and the issue of damages were tried before a jury which rendered a verdict for Autonumerics in the sum of $116,570.00. Bayer filed a motion

* The provisions of the Uniform Commercial Code cited herein conform to the Revised Numbering System pursuant to House Bill 2415, 1984 Legislative Service, 2nd Reg. Sess., Ch. 77.

for new trial. On October 28, 1981, the trial court entered an amended judgment on the verdict, awarding prejudgment interest, attorney's fees and costs and denying Bayer's motion for new trial. Bayer then filed a timely notice of appeal.

This litigation arose out of a contract entered into between Autonumerics as seller and Bayer as buyer for the sale of numerical controls for electronic equipment. This contractual agreement is set forth in several documents. Central to the issues on appeal is whether these documents constitute an "installment contract" within the meaning of § 2–612 of the Uniform Commercial Code (A.R.S. § 47–2612(A).) Bayer argues alternatively that the documents reflect that there was a contract for the purchase of two numerical controls or that there were issues of fact with respect to the intent of the parties which precluded summary judgment. Autonumerics argues that the documents are unambiguous and constitute an installment contract for the purchase of twenty-six numerical controls.

## THE RECORD FOR PURPOSES OF SUMMARY JUDGMENT

The evidence before the trial court at the time summary judgment was granted discloses the following undisputed facts. Autonumerics and Bayer had been negotiating over Bayer's purchase of numerical controls for incorporation into a milling machine manufactured by Bayer. Initially, Bayer was interested in purchasing only one or two controls but discovered it could receive a substantial discount if it purchased a larger number of controls. Bayer sent a written purchase order on its own stationery dated October 17, 1974 for a total of twenty-six controls. This document, purchase order number 3260, states that the order is for twenty-six basic systems and lists a per unit price for the components of each system and a twenty percent discount. It further provides that "if quantity exceeds fifty-one units in twelve month period," a twenty-five percent discount would apply. The purchase

order also contains the statement that it is subject to a five percent price increase on non-shipped items.

Autonumerics responded with a written form acknowledgment to purchase order number 3260. The acknowledgment reiterates the quantity and the per unit component prices stated in purchase order 3260 and contains a quantity discount schedule which provides:

NOTE:

A quantity discount in accordance with the following schedule will apply to all units released for immediate shipment within one year.

Delivery schedule:

| Quantity | Price |
| --- | --- |
| 1–5 | list per above |
| 6–25 | list less 15% |
| 26–50 | list less 20% |
| 51 & over | list less 25% |

If the release quantity exceeds 50 units within the one year time period, a 25% discount shall apply to all units shipped.

Bayer sent two other documents also entitled purchase orders, numbered respectively 3260–1 and 3260–2. Each called for release of a basic system control plus certain additional items at stated prices. Autonumerics responded to these documents with form acknowledgments. The acknowledgments set forth the discounts which Bayer would receive based on its volume order for twenty-six controls.

One of the controls was constructed and shipped pursuant to Bayer's instructions and Bayer received a discount of $5,070.00. However, Bayer refused to accept the second control which Autonumerics had already constructed, and refused to take any other controls.

Initially, it was Autonumerics position that since Bayer had taken only one of the numerical controls during the twelve month period following the original order, it was not entitled to a volume discount. Thus, in December, 1975, Autonumerics sent an invoice to Bayer "back charging" it for the $5,070.00 discount which it had received on the first control. Bayer refused to pay this amount and in July of 1976,

Autonumerics filed suit against Bayer in the state of New York for the amount of the discount. That action was subsequently dismissed for lack of jurisdiction and Autonumerics brought the instant action seeking damages for breach of a contract to purchase all 26 controls.

## SECOND MOTION FOR SUMMARY JUDGMENT

Before considering the major issues involved in this appeal, we first address Bayer's contention that Autonumerics' second motion for summary judgment was a "horizontal appeal" and improperly considered by the trial judge. Autonumerics had filed a motion for partial summary judgment on December 19, 1977 before the Honorable Howard Peterson. Judge Peterson denied the motion. Autonumerics filed a second motion for partial summary judgment on August 25, 1980, approximately two and one-half years later. That motion was granted by Judge Cecil B. Patterson.

Bayer argues that it was improper for Judge Patterson to grant the second motion for summary judgment, citing *Chanay v. Chittenden*, 115 Ariz. 32, 563 P.2d 287 (1977), in which our supreme court disapproved the practice of a trial judge redeciding a motion for summary judgment where no new discovery had taken place. *Id.* at 34, 563 P.2d at 289. *See also Engineers v. Sharpe*, 117 Ariz. 413, 573 P.2d 487 (1977). Bayer argues that the second motion for summary judgment presented nothing new except a reference to Bayer's admission that until the lawsuit was filed it had not informed Autonumerics of its intention not to complete the purchase order.

The parties had engaged in extensive discovery during the two and one-half year period between the first and second motions for summary judgment. The fact that both motions raised the same issues concerning interpretation of the contract documents did not make consideration of the second motion improper. While the two motions were similar, the second motion did raise new arguments demonstrating an absence of factual issues concerning abandonment of the contract. Given the long period of time between the filing of the motions, the extensive discovery conducted in the interim and the differences between the motions, the trial court did not err by ruling on the second motion. We turn therefore to the substance of this appeal.

## WAS THERE A CONTRACT?

The first issue we must decide is whether Bayer's purchase order number 3260 and Autonumerics' acknowledgment of that purchase order constituted an "installment contract" for the sale of twenty-six basic system controls.

Before discussing the legal issues raised, we pause to explain the concept of an "installment contract" as utilized by the Uniform Commercial Code. As discussed in 2 Anderson, Uniform Commercial Code, (2d Ed) § 2–612:4 at 278:

> An installment contract is one providing for the delivery of goods in lots and the separate acceptance of each lot as delivered.

> * * * * * *

> The Code employs the term installment with reference to any contract in performance of which the seller may make deliveries in parts or segments. Many installment contracts will contemplate a fixed pattern of delivery, such as the purchase of 100 tons of coal to be delivered in monthly installments of five tons each on the first working day of each month. The Code does not, however, limit the term installment contracts to such regular or repeating installment contracts, so that if the contract permits or requires the seller to deliver less than all of the goods at one time, the contract is to be classified as an installment contract, without regard to the inequality of the several shipments.

In a nutshell then, the issue decided by the trial court on summary judgment was that the contract between Bayer and Autonumerics was an installment contract for the purchase of twenty-six controls, the

breach of which allowed Autonumerics to seek damages for the lost profits from that total sale. Bayer, in response, contends that an installment contract, as so defined, was not entered into, or because of ambiguities in the contract documents themselves and factual disputes, this issue cannot be resolved by summary judgment.

■ Whether a contract is ambiguous is initially a question of law for the court to decide. *Watson Construction Co. v. Reppel Steel & Supply Co.*, 123 Ariz. 138, 598 P.2d 116, (App.1979); *Slater v. Westland*, 27 Ariz.App. 227, 553 P.2d 1212 (1976). Ambiguity is not established by the mere fact that the parties disagree as to the meaning of its terms. *Giovanelli v. First Federal Savings and Loan Association*, 120 Ariz. 577, 587 P.2d 763 (App.1978); *Bekins Van Lines Co. v. Hartford Insurance Group*, 27 Ariz.App. 655, 557 P.2d 1087 (1976).

It is undisputed that both Bayer and Autonumerics are merchants as defined in A.R.S. § 47–2104[1] and that their transactions were governed by the Arizona's version of the Uniform Commercial Code, A.R.S. § 47–1101 *et seq.* On its face, Bayer's purchase order number 3260 is a clear offer to purchase twenty-six basic control systems. Autonumerics' form acknowledgment, although adding the discount schedule, is likewise clearly an acceptance of the order for twenty-six basic control systems at the agreed upon per unit price. It does not make acceptance conditional upon Bayer's assent to the additional terms and therefore resulted in the formation of a contract. *See* A.R.S. § 47–2207.[2]

■ The contract provides for no definite delivery date but anticipates delivery of each control separately over a period of time. This is evidenced by the acknowledgment calling for shipping "as scheduled" and reference to discounts for units released for shipment within a one year period. The purchase order likewise references a discount for exceeding a quantity release in a twelve month period. Such a contract falls within the definition of an "installment contract" set forth in A.R.S. § 47–2612(A) which provides:

> An "installment contract" is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause, "each delivery is a separate contract" or its equivalent.

While conceding that its initial purchase order was for twenty-six controls, Bayer, nevertheless, asserts that there are numerous ambiguities in the contract documents in question which preclude the conclusion that an installment contract was formed. We consider each assertion separately.

Bayer first contends that the discount schedule which is part of Autonumerics' acknowledgment creates an ambiguity by indicating that Bayer might release as few as one or as many as over fifty numerical controls within one year. It argues that this is inconsistent with Autonumerics' position that Bayer had contracted to purchase twenty-six numerical controls during the first year. It argues that had Autonu-

---

1. A.R.S. § 47–2104(A) provides:

 Merchant means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practice or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

2. A.R.S. § 47–2207 provides in part:

 A. A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

 B. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

 1. The offer expressly limits acceptance to the terms of the offer;

 2. They materially alter it; or

 3. Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

merics believed that Bayer was bound to purchase twenty-six controls during the first year, no discount schedule for any fewer than twenty-six controls would have been listed. We find this argument to be without merit.

■ First, the question is not whether Bayer had agreed to purchase twenty-six numerical controls *within one year*. It is whether Bayer entered into a contract to purchase twenty-six numerical controls, period. The discount schedule is relevant only to the question of the discount Bayer was entitled to receive for each machine released within a one year period. The discount schedule does not attempt to add or alter the basic terms of Bayer's offer conveyed in its purchase order. We find that the discount schedule creates no ambiguity with respect to whether a contract for the purchase of twenty-six control systems was executed.

■ Bayer next alleges ambiguities concerning the optional items ordered in addition to the basic controls. It argues that purchase orders, numbers 3260–1 and 3260–2, were for the basic controls plus additional options and demonstrate that there had been no complete agreement as to the items being purchased. Again, this issue is not relevant to the enforceability of the underlying contract. Autonumerics had a contract to supply twenty-six basic controls to Bayer. If Bayer sought additional options on any of the basic controls, it could order them. The additional purchase orders indicate that Bayer was requesting delivery of two of the basic controls for which it had already contracted along with certain additional optional items. We conclude that the later purchase orders create no ambiguity with respect to the initial order. They simply identify a time for delivery and request additional items.

■ Bayer next argues that the documents do not expressly define the available discounts as OEM, ("original equipment manufacturer discounts"), quantity discounts or quantity OEM discounts. Depo-

sition testimony before the trial court indicated a difference of opinion with respect to the parties' understandings of the nature of the discount. Again, however, we do not find this relevant to whether Bayer had contracted to purchase twenty-six controls. The issue of the proper discount price went to the jury as part of the issue of damages, i.e., was Bayer entitled to the $5070.00 discount on the first machine irrespective of the number of machines accepted.

■ Bayer also argues that the absence of a delivery date in purchase order 3260 and the acknowledgment create an ambiguity that is fatal to contract formation. However, the Code provides that open terms in a contract do not necessarily render the contract unenforceable. A.R.S. § 47–2204(C) provides:

> Even though one or more terms are left open, a contract for sale does not fail for indefiniteness if the parties have intended to make the contract and there is a reasonably certain basis for giving an appropriate remedy.

The Code further provides that in the absence of a specific time for shipment or delivery, a reasonable time will be implied. A.R.S. § 47–2309(A) states:

> The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time.

■ Bayer's next argument is that the merger clause printed on the back of Autonumerics' acknowledgments to purchase orders 3260, 3260–1 and 3260–2 releases Bayer from any prior contractual obligation. The merger clause in question states:

> *This Purchase Order* becomes a binding contract upon the terms and conditions set forth herein when it is accepted either by acknowledgment or by performance. The terms set forth herein constitute the entire agreement and supersedes all previous verbal or written representations, agreements and conditions. (Emphasis added.)

Autonumerics' response is that the printed language on the back of its acknowledgment was the result of a printing error and was intended to be placed on the back of its purchase order form rather than its acknowledgment form. However, Autonumerics argues that even if it is to be held to its printer's mistake, which might be a factual issue, the merger clause in question should be read together with the rest of the acknowledgment document to mean that it supersedes any agreement relating to the specific terms mentioned on the face of the acknowledgment. In this case, the acknowledgments to purchase orders 3260-1 and 3260-2 supersede purchase order 3260 only to the extent that they acknowledge that two of the numerical controls will be manufactured with certain options.

■■■ Any agreement must be construed as a whole, and each part must be read in light of all other parts. *C & T Land and Development Co. v. Bushnell*, 106 Ariz. 21, 470 P.2d 102, 103 (1970); *Brisco v. Meritplan Ins. Co.*, 132 Ariz. 72, 643 P.2d 1042, (App.1982). Where there is inconsistency in a contract, specific provisions qualify the meaning of general provisions. *Brisco, supra* at 75, 643 P.2d at 1045. On the face of the instrument, Autonumerics' acknowledged the existence of purchase orders 3260, 3260-1 and 3260-2, and expressly confirmed respectively, a purchase order for twenty-six numerical controls, and releases for two of those controls. The acknowledgments confirm receipt of purchase orders; nothing on the face of the acknowledgments purports to be a purchase order to which the printed material on the back of the instrument might have reference. Where the written provisions of a contract are inconsistent with printed provisions, the written matter must prevail. *Wilhorn Builders, Inc. v. Cortaro Management Co.*, 82 Ariz. 48, 308 P.2d 251, (1957); *Babbitt Brothers Trading Co. v. Marley*, 28 Ariz. 589, 238 P. 392, (1925). Thus, while the printed form on the back says "this purchase order", it is nevertheless according to its face not a purchase order, but rather a *confirmation* of a purchase order.

However, even if the printed merger clause were to be construed as being applicable to this transaction, we find that the only reasonable interpretation of that clause when read in the context of the entire contract is that it superseded purchase order 3260 only to the extent that it acknowledged that two of the numerical controls would be manufactured with certain options set forth in purchase orders 3260-1 and 3260-2.

■■■ Bayer next argues that the lack of a release for the other twenty-four numerical controls which it had ordered invalidates the contract. Apparently, Bayer is arguing that because Autonumerics did not start manufacturing the other twenty-four units and could not do so until Bayer informed it of the special options which were desired, each release must constitute a separate contract and no contract was formed until each release was received. However, as previously discussed, A.R.S. § 47-2309 expressly provides that the absence of a delivery or release date will not affect the existence of the contract. The fact that Autonumerics waited to commence manufacturing until being informed of a desired delivery date and desired optional items does not invalidate the original contract nor does it impair the enforceability of that installment contract. By definition, an installment contract contemplates the delivery of goods in separate lots to be separately accepted. *See* A.R.S. § 47-2612.

■■■ Bayer's final alleged ambiguity is the fact that there was a provision for a price increase in purchase order 3260. Bayer's general position is that this provision for a five percent price increase in non-shipped items indicates that it was not firmly committed to buy all twenty-six basic control units, at least not all within one year. However, in order for a contract to be enforceable pursuant to the Code, every possible term or contingency need not be delineated. The official comment to U.C.C. § 2-201 (A.R.S. § 47-2201) provides:

The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.

Special emphasis must be placed on the permissibility of omitting the price term in view of the insistence of some courts on the expressed inclusion of this term.... In many valid contracts for sale, the parties do not mention the price in express terms....

Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be signed, a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

Bayer has devoted a substantial portion of its brief to a discussion of *Jaeco Pump Co. v. Inject-O-Meter Manufacturing Co.*, 467 F.2d 317 (10th Cir.1972), to support its contention that summary judgment was improper in this case. It argues that under factually similar circumstances, the United States Tenth Circuit Court of Appeals found that ambiguities made summary judgment improper. In *Jaeco*, the buyer sent the seller a document entitled "purchase order" which provided for the release of certain identified pumps on specified dates. The purchase order did not refer to a total number of pumps to be purchased. Rather, it identified the type of pump and indicated that 100 were to arrive on a specific date and stated "estimated releases" for 600 other pumps. The purchase order further indicated that the buyer would subsequently confirm the release dates. The buyer moved to dismiss the complaint and later for a directed verdict on grounds that the contract was an unambiguous order for only 100 pumps. The trial court permitted the issue of whether an installment contract was entered into to go to the jury. In affirming the trial court's decision to permit the interpretation of the contract to go to the jury, the appellate court ruled that in

view of the "extreme differences of opinion" as to what the agreement actually purported to mean, the court did not err in submitting the question of the existence of an installment contract to the jury.

Unlike the purchase order in the instant case, the purchase order in *Jaeco* did not refer to a total number of pumps to be purchased. Rather, it provided for a definite time to release 100 pumps and estimated releases on the balance. While the facts in *Jaeco* and the instant case are similar, we find significant differences between the documents interpreted in the respective cases. Therefore, we find that, while instructive, *Jaeco* is not determinative of this appeal.

Finally, we recognize that Bayer has cited numerous cases which allegedly support its contention that the written documents in issue did not constitute an installment contract. Rather than discussing each case individually, we note that most are not relevant to the issues of this case; several were decided before the adoption of the Uniform Commercial Code in their respective jurisdictions; some do not involve the sale of separate goods in separate lots; and others were not governed by the Code. We address only two cases, *Nederlandse Draadindustrie NDI B. V. v. Grand Pre-Stressed Corp.*, 466 F.Supp. 846 (E.D.N.Y.) aff'd, 614 F.2d 1289 (2d Cir.1979) and *Candalaus Chicago Inc. v. Evans Mill Supply Co.*, 51 Ill.App.3d 38, 9 Ill.Dec. 62, 366 N.E.2d 319 (1977), heavily relied upon by Bayer.

Bayer argues that the instant case, like *Nederlandse* and *Candalaus*, involves a "divisible" rather than a "entire" contract. However, Bayer fails to recognize that the distinction between "entire" and "divisible" contracts is meaningful under the Code only in connection with the question of acceptance and rejection of deliveries under the contract. This distinction is not relevant to the existence or non-existence of a "installment contract" pursuant to A.R.S. § 47–2612.

The Uniform Commercial Code does not deal with instalment contracts in the sense of such contracts being 'entire' or 'divisible.' Instead, the Code merely gives the buyer certain rights where a delivered instalment is nonconforming, but does not ordinarily permit a buyer to cancel a contract where an instalment is nonconforming. However, the Code permits the buyer to consider the whole contract as breached where a non-conformity or default with respect to one or more instalments 'substantially impairs the value of the whole contract.'

67 Am.Jur.2d *Sales* § 157 at 274 (1973). *See also J. White & R. Summers, Uniform Commercial Code* § 8–3 at 258–260 (1972).

In *Nederlandse,* an action was brought by a manufacturer of steel strand against a manufacturer of pre-stressed concrete for breach of a written contract for the sale of the steel strand to be delivered over a period of time. Thus, the court was faced with an installment contract covered by the terms of the code. While recognizing the applicability of the Code to most of the issues raised in the case, the court nevertheless, and in our opinion erroneously, discussed the distinction between divisible and indivisible contracts. The court concluded that the contract was entire but failed to recognize the Code's elimination of the divisible/indivisible distinction in sales cases. Bayer argues that the factors leading the *Nederlandse* court to find the contract indivisible are absent in the instant case. However, aside from the erroneous legal distinctions drawn, *Nederlandse* involved a contract held to be ambiguous which resulted in factual findings that are far more comprehensive than the record in this appeal. The check-list approach used by Bayer in comparing the two cases is not persuasive in interpreting the provisions of the purchase order and acknowledgment in the instant case.

*Candalaus* involved a paper products manufacturer who sold various sorts of boxes to a distributor. The relationship between the two parties was a continuing one with the distributor periodically purchasing boxes over a period in excess of two years. The parties did not enter into a written contract or even send purchase orders in connection with the transactions. The distributor would simply telephone the manufacturer and order various quantities of its product. The dealings between the parties would probably be characterized as a series of purchases on an open account. No installment contract was involved. The court did not address the installment contract provisions of the Code. Both parties analyzed their cases in terms of pre-code concepts of divisible or indivisible contracts. *Candalaus* is simply not applicable to the instant case because it did not involve an installment contract.

Having reviewed purchase order 3260 and Autonumerics' acknowledgment to that order, we conclude that the trial court correctly found that these documents constituted an unambiguous writing establishing an installment contract for the sale of twenty-six basic numerical control systems.

## DAMAGES

The controversy over damages centers upon which section of A.R.S. § 47–2708 (U.C.C. § 2–708) applies in this case. This statute provides:

A. Subject to subsection B and to the provisions of this chapter with respect to proof of market price (§ 47–2723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (§ 47–2710), but less expenses saved in consequence of the buyer's breach.

B. If the measure of damages provided in subsection A of this section is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (§ 47–2710), due allowance for

costs reasonably incurred and due credit for payments or proceeds of resale.

■ The trial court submitted to the jury only damages under subsection B of this statute. Bayer argues that the trial court erred in applying section B damages and also erred in excluding alleged evidence of the market price of the basic numerical control systems which it contends would be admissible under section A.

In our opinion, the evidence presented does not support Bayer's contentions.

■ There was extensive testimony that Autonumerics could not be adequately compensated by subsection A damages for basically two reasons. First, there was testimony that the damages were based on lost volume, that is, Autonumerics manufacturing capacity was such that it would have been able to supply all its customers and meet Bayer's order for twenty-six controls. Even if Autonumerics had manufactured all twenty-six units and sold to other customers the twenty-five units not accepted by Bayer, it would not have been required as a matter of law to deduct such proceeds from damages caused by Bayer's wrongful refusal. As stated in *Teradyne, Inc. v. Teledyne Industries, Inc.*, 676 F.2d 865, 868 (1st Cir.1982), in interpreting U.C.C. § 2–708(2) [A.R.S. § 47–2708];

> [I]n light of the statutory history of the subsection, it is universally agreed that in a case where after the buyer's default a seller resells the goods, the proceeds of the resale are not to be credited to the buyer if the seller is a lost volume seller-that is, one who had there been no breach by the buyer, could and would have had the benefit of both the original contract and the resale contract.

*See also Famous Knitwear Corp. v. Drug Fair Inc.*, 493 F.2d 251 (4th Cir.1974); *Snyder v. Herbert Greenbaum & Associates Inc.*, 38 Md.App. 144, 380 A.2d 618 (1977). *See generally*, J. White and R. Summers, *supra* § 7–13 at 235–237.

■ Secondly, there was testimony that there were no other customers for the basic control systems ordered by Bayer, that is, the controls were unique to Bayer's needs. There was also evidence that Autonumerics never maintained an inventory of numerical controls because it would have been economically unwise to build a unit on the assumption that there might be purchaser. Controls were built to specific orders following receipt of an order for a specific control which normally came from its network of distributors. In short, Autonumerics argued that there was no market for the control systems ordered, but not taken by Bayer. The absence of such a market would likewise make subsection A damages inapplicable. As stated by the Alabama Supreme Court in *Neumiller Farms, Inc. v. Cornett*, 368 So.2d 272, 275 (Ala.1979):

> It is implicit within this provision [U.C.C. 2–708], however, that, in order to employ the damage formula of subsection (1), there must not only exist a market for the contracted goods but also the aggrieved seller must have a legal obligation to enter that market in his effort to avoid the foreseeable adverse consequences of buyer's breach of contract. Unless there is both a market and an obligation to enter it, the subsection (1) measure of damages is functionally inadequate and the aggrieved seller may seek redress through application of the measure of damages provided in subsection (2).

*Accord Anchorage Centennial Development Co. v. Van Wormer & Rodrigues, Inc.*, 443 P.2d 596 (Alaska 1968); *Cesco Manufacturing Corp. v. Norcross, Inc.*, 7 Mass.App.Ct. 837, 391 N.E.2d 270 (1979); *Timber Access Industries Co. v. U.S. Plywood-Champion Papers, Inc.*, 263 Or. 509, 503 P.2d 482 (1972); *Copymate Marketing Ltd. v. Modern Merchandising, Inc.*, 34 Wash.App. 300, 660 P.2d 332 (1983).

■ However, Bayer claims that it was denied the opportunity to prove the market price of the goods when the trial court excluded several exhibits as evidence. However, our review of this evidence [Exs. 46, 65, 66, 67, 68] reveals that these exhibits demonstrated prices on what Bayer

deemed to be comparable goods.[3] Moreover, the excluded exhibits did not demonstrate the existence of buyers for Autonumerics' basic controls. In essence, they were arguably relevant to market price, but not the existence of a market. Testimony was permitted with respect to whether Autonumerics could have found buyers for the control systems at issue. We find no error in the trial court's exclusion of the exhibits in question.

 Finally Bayer argues that the trial court erred in instructing the jury on damages. We find no error. In so concluding, we recognize the general principle that in determining whether an instruction should be given, the evidence must be viewed in the strongest possible light to the party requesting the instruction. *Starr v. Campos*, 134 Ariz. 254, 655 P.2d 794 (App.1982). Nevertheless, we find that Bayer's proposed jury instructions were properly rejected. The requested instructions related to mitigation of damages and provided:

> If you find that Autonumerics was in fact damaged by Bayer's not taking the rest of the controls, and if you find that there was a market for the rest of the controls in 1975, then the difference between the contract price to Bayer and the market price shall be the measure of damages, less any expenses saved by Autonumerics because of Bayer's not taking the rest of the controls.
>
> You are instructed that Autonumerics cannot recover for losses that Autonumerics could reasonably have avoided. Autonumerics had the duty to take reasonable steps to mitigate or lessen any damages that Autonumerics claims to have suffered. Thus, if Autonumerics was damaged by the failure of Bayer Industries to take the other controls, it must appear that Autonumerics took reasonable steps to mitigate or lessen the damages that it claims to have suffered.

Accordingly, if a market existed for the controls which Bayer Industries did not take and such market fairly was or fairly appeared to have been within reason at the time, then Autonumerics had a duty to try to sell in that market the controls that Bayer Industries did not take.

One of the instructions that was given by the trial court on the issue of damages was as follows:

> If Autonumerics did not have the productive capacity to manufacture the rest of the controls, and, in addition, supply the rest of the demand for its controls, then you shall find for Bayer and against Autonumerics and assess *no damages* against Bayer for lost profits. (Emphasis added.)

As previously discussed, if Autonumerics could demonstrate that it had lost volume because of Bayer's repudiation, it was not required to mitigate damages in the sense of selling these products to others. The court's instruction put Autonumerics in the position of having to prove and convince the jury that it had the capacity to produce the additional twenty-five controls and thus was a lost volume seller. If it failed in this position, the jury was instructed to find that Autonumerics was not entitled to any damages. Under this all or nothing approach, if Autonumerics proved it was a lost volume seller, mitigation (in the sense of resale) was immaterial. If it failed in such proof, no damages were collectible and mitigation again becomes immaterial. Bayer is simply not harmed by the trial court's refusal to give Bayer's proposed instructions which would have provided an alternative theory of recovery to Autonumerics.

## PREJUDGMENT INTEREST

 Bayer's final argument is that Autonumerics should not have been awarded

---

**3.** Objections were made to these exhibits on the basis of relevancy as well as to the fact that no market existed for the control systems in question and that Autonumerics sought damages on the basis of lost volume. The trial court deferred ruling on these objections based on relevancy until it determined whether Autonumerics was entitled to recovery pursuant to subsection A or subsection B. We note there was substantial question concerning whether these exhibits reflected prices for comparable products in comparable markets.

pre-judgment interest on its claim. The general rule in Arizona is that a plaintiff is entitled to an award of pre-judgment interest on a liquidated claim.

A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion.

*Arizona Title Insurance & Trust Co. v. O'Malley Lumber Co.*, 14 Ariz.App. 486, 496, 484 P.2d 639, 649 (1971). *See also In Re Estes' Estate*, 134 Ariz. 70, 654 P.2d 4 (App.1982).

Bayer argues that the evidence in this case demonstrates that it was not possible to compute the amount of damages for lost profits with exactness without reliance upon opinion or discretion.

 A.R.S. § 47–2708(B) provides for lost profits calculated both as net profits and the inclusion of "reasonable overhead." There were substantial disputes with respect to what constituted reasonable overhead and what items were properly attributable to the cost of producing the items in question. Under these circumstances, we agree that opinion testimony and discretionary judgments were involved in that determination. Therefore, the damages for lost profits were not liquidated. We remand this matter to the trial court for modification of the judgment by deletion of pre-judgment interest in accordance with this opinion.

In this appeal, Autonumerics has requested attorneys' fees pursuant to Rule 21(c), Arizona Rules of Civil Appellate Procedure. In its discretion, this court denies an award of attorney's fees.

MEYERSON, P.J., and OGG, J., concur.