United States Court of Appeals,

Fifth Circuit.

No. 91–4781.

FIBERLOK, INC., Plaintiff, Counter–Defendant–Appellant,

v.

LMS ENTERPRISES, INC., Defendant, Counter–Claimant–Appellee.

Nov. 10, 1992.

Appeal from the United States District Court for the Eastern District of Texas.

Before JONES and WIENER, Circuit Judges, and LITTLE, District Judge.[*]*

LITTLE, District Jud:

Fiberlok, Inc., the plaintiff-appellant, is the licensor of bonded fiber cushioning processes and products. Fiberlok entered into two agreements with LMS Enterprises, Inc., the defendant-appellee. The first of these agreements was a supply contract in which LMS agreed to supply Fiberlok with resin. In addition there was a milling agreement between the parties under which LMS was to mill resin for Fiberlok's licensees. In conjunction with these agreements, Fiberlok advanced funds and loaned equipment to LMS.

On 9 August 1988, Fiberlok commenced this action seeking the return of equipment held by LMS and damages for conversion of resin, resin overcharges and negligent destruction of equipment. LMS counterclaimed stating causes of actions for trade infringement, fraudulent inducement, and breach of the supply contract. The district court denied Fiberlok's demands and ruled in favor of LMS on its counterclaims. The district court reasoned that Fiberlok fraudulently induced LMS to enter into the contract and that Fiberlok made several material breaches of the contract. The district court ruled that LMS was entitled to recover slightly over $460,000 for lost profits over the contract period, subject to an offset of slightly over $66,000. Accordingly, the district court rendered judgment for LMS in the amount of $406,727, together with pre-judgment and post-judgment interest. Fiberlok now brings this appeal. Fiberlok does not contest the district court's findings on

[*]District Judge of the Western District of Louisiana, sitting by designation.

liability. Rather, this appeal concerns the district court's determination of quantum bound principally to the issue of lost profits. We affirm the judgment of the district court.

## FACTS

Because the issues on appeal are related to the calculation of damages only, the facts in this case are for the most part undisputed, but painfully complicated. Therefore, this court adopts the district court's findings of fact as they relate to liability, and only those findings of fact pertinent to quantum, the issue of this appeal, are discussed.

Fiberlok, Inc. ("Fiberlok"), is a Tennessee corporation engaged in the business of fiberbonding. It maintains its principal office and place of business in Memphis, Tennessee and is authorized to do business in the state of Texas. George Buck is the chairman and chief executive officer of Fiberlok.

Fiberlok owns patents on a process for making nonwoven pads, batts and other structures that employ certain thermoplastic resins that are distributed in the fibers that make up the structure. The fibers are subsequently heated, caused to melt, and then refrozen or cooled so that the structure holds its desired final configuration (the "Fiberlok process"). The Fiberlok process is used to manufacture a variety of textile based products such as the inside of a mattress or the cushion portion of a chair or car seat. These various kinds of cushioning are referred to as cushion batts, pads, or mats. Manufacturers that produce structures using the Fiberlok process compete against manufacturers that produce nonwoven pads and batts by other processes and also against manufacturers who make alternatives such as foam rubber. Therefore, Fiberlok has an interest in assuring the availability of thermoplastic resins at prices that make the structures produced with the Fiberlok process an economical alternative to other forms of processing batts and pads.

LMS Enterprises, Inc. ("LMS"), is a Texas corporation, engaged in the business of manufacturing drilling fluid and dry powdered resins for polyvinyl chloride (PVC) pipe and fiberbonding applications. LMS maintained its principal office and place of business in Longview, Texas. Hans Krier, Heinz Krier and Egon Dangel were the principals of LMS.

In November of 1985, LMS and Fiberlok began discussing the formation of a resin supply

contract. A draft of the contract provided that LMS's total output of micronized resin under the FLEX–LOCK designation would be sold to Fiberlok. The draft further stated that "Fiberlok estimate[d] that annual resin use by its current licensees [would] be not less than 3,000,000 pounds after introduction and acceptance in 1986 and that resin use by current and new customers and (sic) [might] exceed 6,000,000 pounds in 1987 depending on satisfactory price." In other words, Fiberlok's annual resin needs to satisfy its contractual obligations were 3,000,000 pounds. If business improved, the need could double.

In late 1985, Dow Chemical Company (Dow), LMS's supplier of SARAN, Dow's trade name for its resin blends, began to reduce LMS's supply. By the end of February 1986, LMS could no longer purchase desirable resin from Dow. Fiberlok was informed of the loss of supply. LMS searched for another source of supply. This absence of a reliable source of resin caused LMS and Fiberlok to suspend their contract discussions.

Both LMS and Fiberlok experimented with resins that could possibly serve as alternatives to Dow's product, and exchanged or discussed the results with each other. In addition, LMS communicated with a variety of brokers and suppliers of resins in hopes of finding a suitable resin for fiberbonding. LMS called Joyce Torregrossa, a broker, who operated Surplus Chemicals Marketing, Inc. ("Surplus Chemicals"). Dangel and Krier, employees of LMS, had been buying off-grade PVC from Torregrossa since early 1981. Continuing its search, LMS obtained a sample of VSSS/VSSP, a solution vinyl resin from the producer, Union Carbide Corporation ("Union Carbide" or "UCC"). LMS tested and approved use of the material as it was relatively easy to grind and melt.

In July of 1986, Fiberlok concurred with LMS as to the utility of the VSSS/VSSP resin. The parties agreed to market the newly discovered product as Flexlok 052. With a new source of resin located, LMS and Fiberlok decided to renew their contract negotiations. A binding contract was confected. The district court found that the contract required Fiberlok to purchase at least 3,000,000 pounds of resin per year in twelve monthly installments of 250,000 pounds, and that under the terms of the contract, LMS would be Fiberlok's exclusive supplier of resin.

Post contract, LMS suspicioned that Fiberlok was not purchasing resin amounts as promised.

In November 1986, LMS officials complained to Buck that Fiberlok was violating the contract by not dealing with LMS as Fiberlok's exclusive supplier of resin. In a spirit of cohesiveness, the parties entered into a milling agreement in which LMS promised to be Fiberlok's exclusive miller. Milling is a process of mixing and blending resins and grinding the mixture into a fine powder referred to as micronized resin. The parties agreed that LMS would be paid $0.125 per pound for milling Flexlok. Buck intended to have LMS mill the resin that Fiberlok had purchased from an outside supplier. Following this agreement, in early December 1986, Buck purchased approximately 210,000 pounds of resin from Heller & Co. ("Heller"). Heller is a resin broker, not a manufacturer of resin. The Heller resin, referred to as MC20 and MC29, was delivered to LMS for milling.

Until December of 1986 LMS had been purchasing the Union Carbide produced resin from Surplus Chemicals, a broker. In December, LMS began having cash flow problems. Fiberlok and Surplus Chemicals, through their respective agents Buck and Torregrossa, began communicating directly about their material. On 9 December 1986 LMS and Surplus Chemicals executed an agreement whereby Surplus Chemical agreed to give LMS first right of refusal for VSSS/VSSP off-grade resin for the next two years. However, LMS did not have cash available to purchase the resin Surplus Chemicals was offering for sale. Therefore, on 19 December 1986, LMS executed a release of Surplus Chemicals so that Fiberlok could purchase the resin directly from Surplus Chemicals. In addition, in March of 1987 Fiberlok leased equipment to LMS. The milling agreement was also amended after LMS said it could not afford to mill at the original agreed upon price of $0.125 per pound. The parties agreed to revise the amount to $0.21 per pound.

In July of 1987, Fiberlok again purchased resin from Heller and shipped it to LMS for milling. The 200,000 pounds Fiberlok purchased from Heller, Heller had acquired from Union Carbide. The following month LMS purchased 38,000 pounds of resin from a Union Carbide plant in West Virginia as well as a load of resin from Keysor, a California manufacturer of PVC/PVA vinyls. LMS purchased a total of five resin loads from Keysor from August through November 1987.

It was during the summer of 1987 that the relationship between Fiberlok and LMS began to deteriorate. Fiberlok sent LMS a letter demanding a formal cancellation of the supply contract.

Fiberlok reasoned that the contract had not worked "after January of this year because LMS was not able to purchase and supply the resin we need." This letter did not make reference to the quality of the resin milled. Compounding the problem, Fiberlok began deducting four cents per pound from the twenty-one cents per pound it was paying LMS for milling in order to recover its prepayments to LMS.

In February 1988, Fiberlok discussed with Heller the possibility of purchasing more resin. Large quantities of this material were eventually purchased and shipped to Wedco Technology, a company to which Fiberlok had sent a sample in March of 1987 for test grinding.[1] In March of 1988, Fiberlok informed LMS that Fiberlok was receiving invoices for milling that had not occurred. Fiberlok also reported that it would have its resin milled in Memphis.

On 9 August 1988, Fiberlok commenced this civil action in the United States District Court for the Eastern District of Texas seeking, among other things, the return of equipment wrongfully held by LMS, damages for conversion of resin, resin overcharges and negligent destruction of equipment. LMS counterclaimed for trade secret infringement, fraudulent inducement, and breach of the supply purchase contract. As we previously reported, the district court found for LMS on the fraudulent inducement and breach of contract claims, awarded LMS lost profits of $460,000 and found that Fiberlok was deserving of slightly over $66,000 on its claims. Judgment of $406,727 plus pre- and post-judgment interest was granted. The issue on appeal is not whether Fiberlok is guilty of fraudulent inducement and breach of contract but whether the district court properly calculated lost profits.

STANDARD OF REVIEW

The district court's findings of fact are reviewed under the clearly erroneous standard. *Howerton v. Designer Homes By Georges, Inc.,* 950 F.2d 281, 283 (5th Cir.1992). Conclusions of law are reviewed de novo. *Id.*

---

[1]Wedco is located in New Jersey. Fiberlok was trying to find a company on the east coast that could grind resin and distribute it to a Fiberlok licensee in the east. Therefore, Fiberlok sent samples of resin for test grinding to several companies in the region. Wedco was able to grind the resin to a powdered form that met Fiberlok's specifications.

## LOST PROFITS

Appellant argues that LMS's profits are unrecoverable as speculative because LMS was an unestablished business. The district court correctly noted, applying applicable Texas substantive law, that damages will not be awarded for lost profits that are merely speculative in nature. Proof of anticipated profits cannot be bottomed upon uncertain and changing conditions. *Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.1980, *writ ref. n.r.e.*). Such a result would be speculative indeed. But, it is not necessary that recovery for future profits should be established by exact calculation, as it is enough to have data from which these profits may be ascertained with a reasonable degree of certainty and exactness. *Id.*

Appellant correctly posits that prospective profits are not recoverable for a newly established business or for a business that has operated at a loss. The former has no track record, and the latter is an established loser. We have no quarrel with those conclusions. *See e.g., McBrayer v. Teckla, Inc.,* 496 F.2d 122, 127 (5th Cir.1974). However, LMS was neither an unestablished business at the time the contract was confected nor when it was breached. LMS had been in the business of manufacturing micronized resins for use in fiberbonding for more than a year prior to contract execution, and LMS's financial statements indicate that year was a profitable one.

In addition, after the parties contracted, LMS's sole raison d'etre was to perform its contract with Fiberlok. The general rule that lost profits are not recoverable for a new and unestablished business does not apply to a business established on the basis of a contract sufficiently specific in nature as to allow credible prediction of the amount of lost profits, particularly if factual data is available to furnish a sound basis for computing probable loss. *See e.g., Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348 (1955), *First Title Co. v. Garrett,* 802 S.W.2d 254, 260–61 (Tex.App.—Waco 1990, *no writ*). The contract between LMS and Fiberlok was sufficiently specific in terms of subject matter, price and quantity to allow calculation of lost profits with reasonable certainty.

## CALCULATION OF NET PROFITS WITH REASONABLE CERTAINTY

Appellant's second argument also stems from the contention that the profits sought by LMS

depend on uncertain conditions, and therefore LMS is not entitled to recovery. In support of this argument, Fiberlok asserts that LMS never presented probative evidence that, but for Fiberlok's actions, it could have, through the business contacts available to it, procured any resins that were not in fact purchased by either LMS or Fiberlok.

In awarding damages, the district court found, based on prior purchases, that LMS could procure 262,000 pounds of resin per month to satisfy the contractual requirements of LMS by purchasing 80,000 pounds of UCC resin from Surplus Chemicals, 44,000 pounds from Keysor, and 138,500[2] pounds from Heller & Company for the years remaining in the contract. The price per pound of this resin was estimated based on prior purchases. Appellant asserts that the district court erred in finding that LMS could procure these quantities of resin.

The district court found that LMS could have purchased resin in the market place to fulfill the contract purchase requirements of Fiberlok. When making its factual analysis, the district court reviewed the purchasing history of LMS and other evidence presented by resin sellers. The fault with the district court's opinion, according to Fiberlok, centers on the quantity of resin available in the market place. The nub of the appellant's distress is best described in a simple example. If, on a historical basis, LMS purchased 50,000 pounds per month from Heller, 80,000 pounds per month from Surplus Chemicals, and 20,000 pounds per month from Keysor, one could conclude that LMS could purchase 150,000 pounds of resin per month in the market place. But Heller and Surplus Chemicals are not producers, they are merely brokers, and Heller's inventory was purchased from Union Carbide as was Surplus Chemicals'. Union Carbide has the ability to produce only 80,000 pounds per month. Thus the market is capable of producing only 100,000 pounds of resin per month.

Appellant argues that the district court erred when it calculated the amount of resin available to LMS by purchase from suppliers of resin. For example, the district court's assumption that Heller

---

[2]The district court's Conclusions of Law Relating to Damages actually states that LMS could procure 1,662,000 pounds of resin per month from Heller. This number clearly exceeds the monthly amount required under the supply contract. The district court appears to have inadvertently included the annual amount, as 1,662,000 is exactly twelve times the amount needed, along with the Surplus Chemicals and Keysor resin, to make up the 262,000 pounds of resin that LMS must procure each month under the district court's analysis.

& Company could procure 138,500 pounds per month is based on purchases made by Heller in 1987. Appellant contends that the purchases made by Heller were from Union Carbide, and therefore the district court double counted the amount of available UCC produced resin. In addition, appellant argues that Heller could not have procured resin from any other source but UCC because the supply of acceptable resin is limited. Appellant further argues that the Keysor supply of 44,000 pounds of resin is in error. Appellant claims that the Keysor supply was of a substandard quality and that it had to reject two of the five resin loads that LMS bought from Keysor. Also, appellant argues there is no evidence that Keysor resin would ever again become available or would be a dependable source of suitable resin.

At this point, we feel it is necessary to observe that neither the appellant nor appellee produced expert testimony at trial regarding lost profits. This left the determination of lost profits to the district judge. The district court employed a common method of estimating lost profits; it estimated lost profits based on prior years' data with minor adjustments to account for annual increases in costs. The district court provides a competent and detailed description of the methodology in its Conclusions of Law Relating to Damages. The method, which we adopt, has not been contested on appeal, only the components of the method dealing with LMS's inventory costs.

In its estimation of lost profits, the district court looked to LMS's and Fiberlok's[3] prior resin purchases to determine future purchases and purchase prices. LMS's and Fiberlok's prior purchases from Surplus Chemicals and Heller were used only to provide a basis for the type of suppliers that would provide the various amounts of resin and the purchase prices. There is no evidence in the record that clearly supports the appellant's contention that there was not enough resin available in the market as a whole to provide LMS with 3,000,000 pounds of resin per year. The district court does not purport to assume that Surplus Chemicals, Heller and Keysor would supply LMS with resin from

---

[3]The district court found it necessary to look to both LMS's and Fiberlok's prior purchases because Fiberlok purchased some resin directly, rather than through LMS who was to be Fiberlok's exclusive supplier of resin under the terms of the supply contract. For example, on three occasions Fiberlok purchased directly from Heller, and Fiberlok also purchased directly from Surplus Chemicals when LMS began to have cash flow problems related to Fiberlok's breach of the supply contract.

the same sources, rather the district court merely used past purchases as a means of estimating future purchases and future purchase prices.

The appellant's core argument is that Heller could not obtain resin from UCC if Surplus Chemicals was selling all of UCC's resin supply to LMS. While this is true, there is nothing in the record that supports the appellant's argument that Heller could not obtain resin from other sources. Heller is a resin broker and as such is not limited to one source of resin. Fiberlok obtained resin from Heller in at least two other transactions, and there is no indication in the record, nor does appellant argue, that these Heller purchases were of UCC origin. Although the record indicates that the resin market can at times be limited in supply, there is enough evidence to support the district court's conclusion that supply would not be an issue in the calculation of lost profits. Therefore, we cannot say that the district court's supply findings are clearly erroneous.

As for the quality of the Keysor supply of resin, the record evidence indicates that Fiberlok only rejected the Keysor resin after LMS sought to prevent Fiberlok from purchasing from Keysor directly. Again, it appears that the district court was only using the suppliers and their prior sales of resin to LMS and Fiberlok as a means of estimating future sales to LMS. The district court only used the three mentioned suppliers as a means of estimating LMS's future purchases; it did not indicate that these were the only suppliers in the market or that LMS must have purchased its resin from these suppliers. As noted above, it is not necessary that profits should be susceptible of exact calculation, but it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness. *Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.1980, *writ ref. n.r.e.*).

## MEASURE OF DAMAGES

Fiberlok challenges the district court's application of § 2.708, alleging that the court erred in applying subsection (b) of the statute rather than subsection (a). Section 2.708 of the Tex.Bus. & Comm.Code provides:

> (a) ... the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach.

(b) If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 2.710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Under subsection (a), LMS is required to mitigate its damages. Fiberlok alleges that LMS should have continued to purchase resin and sell it to other distributors. LMS never attempted to mitigate its damages in this manner. The district court found, however, that Fiberlok's failure to perform under the contract was a direct cause of the closing of LMS's business and therefore excused LMS from the duty to mitigate. Appellant asserts that LMS did not mitigate because it did not have the ability to operate its own plant since it had never acquired sufficient working capital. The district court's selection of applicable law is particularly informative. As the district court notes, subsection (a) is applicable in most situations, but courts have applied § 2.708(b) in situations when a seller/manufacturer ceases production after the buyer's breach. *Stewart & Stevenson Services Inc. v. Enserve, Inc.,* 719 S.W.2d 337, 343 (Tex.App.—Houston [14th Dist.] 1986 *writ. ref'd n.r.e.*) (citing *Scullin Steel Co. v. Paccar, Inc.,* 708 S.W.2d 756 (Mo.Ct.App.1986); *Autonumerics, Inc. v. Bayer Industries, Inc.,* 144 Ariz. 181, 696 P.2d 1330, 1340 (Ct.App.1984); *Bead Chain Manufacturing Co. v. Saxton Products, Inc.,* 183 Conn. 266, 439 A.2d 314, 320 (1981)). *Scullin Steel* is especially applicable as that case held that lost profits would be awarded under § 2.708(b) because the defendant's "breach was a direct cause of the [plant] closing." *Scullin Steel* 708 S.W.2d at 763. This conforms to the language of the statute. In addition, as the district court points out, this position is consistent with the discussion of section § 2.708(b) in *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.,* 616 F.2d 212, 215 (5th Cir.1980) (Citing to the following language in *American Metal Climax, Inc. v. Essex International, Inc.,* 16 U.C.C.Rep. 101, 115 (S.D.N.Y.1974): "[C]ompensatory damages as provided in the contract-market formula of § 2708(1) [§ 2.708(a) ] are realistic only where the seller continues to be in a position to sell the product to other customers in the market."). If the seller is unable to mitigate because of the buyer's breach, applying subsection (a) would provide inadequate damages because it would be unfair to penalize the seller for failure to mitigate when the inability to mitigate was due to the fault of the buyer. In such situations, subsection

(b) would be the proper measure of damages.

At issue in this case is who was responsible for LMS's inability to mitigate. If LMS was unable to mitigate its damages because it was under capitalized, then subsection (a) would apply. However, if, as the district court held, Fiberlok's failure to perform under the contract prevented LMS from performing, then LMS is excused from its duty to mitigate. This is a finding of fact and subject to the clearly erroneous standard of review.

The district court found that Fiberlok's failure to comply with the terms of the contract prevented LMS from paying for its overhead expenses and for its purchases of resin. Therefore, the district court held, because Fiberlok was the cause of LMS's inability to perform under the contract, § 2.708(b) was applicable. This finding of fact is supported by the record as Fiberlok's failure to purchase resin in accordance with the contract caused LMS to experience a cash short fall. Therefore, the district court's finding, that it was Fiberlok which was responsible for LMS's inability to mitigate damages and not LMS's under capitalization, was not clearly erroneous. Because LMS was unable to mitigate damages due to Fiberlok's breach, we uphold the application of Tex.Bus. & Comm.Code § 2.708(b) in this situation.

CONCLUSION

We hold that the district court did not err in finding that LMS was an established business, and also hold that lost profits were a proper measure of recovery. The district court's calculation of lost profits was not speculative as the data from which the lost profits were ascertained allowed for calculation with a reasonable degree of certainty and exactness. In addition, the district court properly applied Tex.Bus. & Comm.Code § 2.708(b) in this situation as it was Fiberlok's breach that caused LMS's inability to mitigate damages.

AFFIRMED.