REVISED

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 95-30493

TRUST COMPANY OF LOUISIANA,

Plaintiff-Appellee,

versus

N.N.P. INC.; L.C.E. INTERNATIONAL INC.;
LAWRENCE R. LEAL; WILLIAM M. MOORE;
RELIANCE CAPITAL ASSOCIATES; DAVID
LLOYD; GRANT CURTIS; JOHNSON & GIBBS;
DANIEL M. MATHESON, III; M. SHEPPARD STRONG;
DENNIS A. JAMIESON; JAMES F. CRANK,

Defendants,

and

ROBERT H. WYSHAK; GEORGE EGGLESTON;
ROBERT H. WYSHAK & ASSOCIATES,

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Louisiana

January 23, 1997

**OPINION ON PETITION FOR REHEARING**

Before BENAVIDES, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The petition for rehearing is denied. The opinion reported at 92 F.3d 341 (5th Cir. 1996) is withdrawn, and the opinion below is substituted in all respects for the withdrawn opinion, 92 F.3d 341.

**FACTS**

This civil litigation grew out of a complex scheme developed in Texas by several defendants not party to this appeal. The object of the scheme was to entice institutions like the plaintiff TCL into lending money they would not otherwise have lent. The perpetrators of the scheme (hereinafter collectively referred to as "Reliance,") represented to potential investors that they controlled certain Government National Mortgage Association Certificates ("GNMAs") and intended to use the GNMAs as collateral. When a potential investor agreed to invest in one of the perpetrators' various shell corporations, the investment was structured as a loan. Those loans were evidenced by several notes, and the notes themselves were purportedly secured by a security interest in certain listed GNMAs. The notes themselves, however, were mere paper, because a security interest in a GNMA cannot be created by means of the complex scheme developed by the defendants which included the filing of a UCC-1 statement.

The Government National Mortgage Association (the "Association") guarantees privately issued securities backed by pools of FHA or VA mortgages, and these securities are commonly referred to as GNMAs. According to the testimony of William D. Hawkland, former Chancellor and Professor of Law at Louisiana State University, the Association warrants the performance of the private issue, guaranteeing that investors in GNMAs will receive monthly "pass-through" of principal and interest payments due on the pooled mortgages, even if the original mortgagors on the underlying loans do not make their payments or the lenders on the underlying loans default. Chemical

2

Bank [now merged with Chase Manhattan] is the Association's authorized transfer agent, and issues all GNMA certificates. Approximately 96% of the certificates are issued to Participants Trust Company ("PTC") and held by Chemical Bank in its capacity as custodian for that company. The few certificates not issued to PTC are registered by Chemical Bank in the name of individual buyers and the certificates themselves are physically delivered to these buyers. The PTC certificates are locked in Chemical Bank's vault and thereafter dealt with on an uncertificated basis. PTC employs a book entry system to effect transfer of the uncertificated GNMAs, and deals directly only with certain large financial intermediaries called "Participants." The Participants themselves deal with brokers and banks who in turn deal with individual customers. Going down the chain, each dealer records the transactions in its own books. Thus, ownership of uncertificated GNMAs is established by following the chain of book entries, and a security interest in an uncertificated GNMA can only be perfected where the pledge is registered on the books of a financial intermediary in the name of the secured party. In the case of a certificated GNMA, a PD-1832 form must accompany the actual certificate in order to endorse a GNMA, thus a security interest in a certificated GNMA cannot be created unless the note establishing that interest is accompanied by the certificate and its associated PD-1832.

In the case at bar, the trial court found that none of the defendants actually held any interest in any of the GNMAs listed in TCL's two notes, and thus the loans made were not backed up by any collateral. TCL loaned $2,500,000.00, thinking that it was investing in a long distance telephone company and that the investment was backed up by certain GNMA's. TCL only discovered the fraud when N.N.P. Inc. ("NNP") and L.C.E. International Inc. ("LCE"), the shell corporations to which it had loaned the money through Reliance, defaulted on the loan. Because the money TCL had

3

loaned to the scheme came from seven ERISA plans managed by TCL and Ruston State Bank, pursuant to federal law, TCL restored those institutions to *status quo ante* by paying principal, attorneys' fees, and interest.

By the time the case came to trial, many of the original 20 defendants had already settled with TCL, and some had been convicted of various wire fraud charges connected with the scheme. The remaining defendants included Reliance Capital Associates, Lloyd, Jamieson, Wyshak, Eggleston, Wyshak & Associates, and Grant Curtis. Lloyd had become a fugitive from justice and did not appear for trial. Curtis also did not appear for trial. Jamieson appeared pursuant to a writ of habeas corpus ad testificandum, having agreed to testify as a witness for TCL in exchange for dismissal as a defendant in the instant civil litigation. Wyshak and Eggleston appeared for trial *pro se*, though they ignored the scheduling order and their failure to comply with discovery orders led to severe sanctions.

Jamieson testified that he and another of the defendants approached Eggleston and asked if Wyshak's law firm would serve as custodian of the GNMA's for various investors in the scheme. Eggleston, a non-lawyer previously convicted of securities fraud, worked with Wyshak in the law firm. Reliance believed that a potential investor would be reassured and more willing to invest if he thought that he could get possession of the notes from Wyshak's law firm in the event of a default. Wyshak agreed to act as custodian in March, 1990.

At trial, Jamieson presented evidence from which the trial court adduced that Wyshak knew the Reliance transactions were not backed up by interest in any GNMA's, and that he and Eggleston misrepresented what they held. While it was apparently Wyshak who carefully crafted letters to imply that the assets held in custody included the GNMA's themselves, Eggleston built the law firm's

4

"due diligence" file which made it look as if the law firm had carefully made sure that the transactions were indeed backed by GNMAs. According to Jamieson, it was Eggleston who drafted or tailored a number of the supporting documents that lent credence to the scheme. Eggleston helped in fabricating a statement of account and a comfort letter from Johnson & Associates, purportedly an accounting firm. Eggleston also told Jamieson how to create a fake account statement from the Republic National Bank in Panama for the custodial files. For his part, Wyshak also tried to demonstrate that he had performed due diligence in assuring that the securities involved existed. Wyshak asked to meet the purported owner of the GNMA's at issue. Jamieson and the other principal perpetrators of the scheme secured the services of an actress who told Wyshak that she was Rosa Kant, a Panamanian citizen who represented some leaders in Central and South America and who wanted their monies invested secretly and confidentially. No evidence was presented to indicate that Wyshak further investigated this story that the money used to purchase the GNMAs was laundered drug money from out of the country, nor was evidence presented to indicate that he ever actually asked to see the GNMA certificates allegedly owned by the fictitious Rosa Kant.

Further acts established that Wyshak knew or should have known that the perpetrators did not in fact own the GNMAs in question. Wyshak and Eggleston listed some of the GNMAs as assets of Fidelity Asset Insurance, an insurance company of which they were trying to gain ownership. In connection with this endeavor, Eggleston had Jamieson pose as an officer of Fidelity Asset Management. When the Utah Insurance Commission began to investigate Fidelity Asset's books and could not trace the true ownership of the GNMAs listed as assets, the commission put the company into receivership. Jamieson testified that he received a phone call from Eggleston after an FBI agent had seized Eggleston's briefcase at Wyshak's office with Wyshak present in connection with a

5

different transaction involving a purported and unverifiable security interest in the same GNMAs, yet Wyshak continued to participate in deals involving Reliance and the GNMAs, including the instant representation to TLC that he was holding the GNMAs on assignment for them.

The TCL transaction closed on June 26, 1990. Jamieson testified that Eggleston at least was aware of the transaction. Moreover, letters indicated that Wyshak was undoubtedly aware of the transaction as well. On June 26, 1990, Reliance sent a copy of the custodial agreement to Wyshak, requesting that Wyshak execute it and return it to TCL. Additionally, Eggleston received a letter dated June 25, 1990, from Jamieson, stating:

> Concerning the transaction with LCE (Larry Leal). If you would, please have Mr. Wyshak execute two custodial agreements and return to me. There will be a call in this from Mr. Jimmy Crank of the Trust Co. of Louisiana, Trust Department of the Ruston State Bank of Ruston, Louisiana [TCL], on the Standard Verification of Assets, Etc. His main concern is the time frame of liquidation in case of a default, so if you could word this right to him I think he will relax.

Jamieson testified that Wyshak had agreed to act as custodian in return for "custodial fees" in the amount of a certain percentage of the amount of each loan. As time went on, Reliance became impatient with paying the custodial fees and did not inform Wyshak of a number of transactions. Wyshak became aware that he was not getting custodial fees. After a series of increasingly unpleasant letters, the parties agreed to break off the arrangement. In December, 1990, Wyshak even sent a letter to Jamieson in which he declared that his firm had evidence that Reliance's transactions were fraudulent. Shortly thereafter, in January, 1991, TCL became concerned about the security of its loan, and wanted reassurance from Wyshak. Reliance did not want to jeopardize this very large transaction, and renegotiated with Wyshak. On January 30, 1991, Wyshak faxed the following letter to TCL as well as to the ostensible head of L.C.E., Inc.:

6

Dear Mr. Leal:

This letter is to confirm that our Law Firm as custodian pursuant to the Contribution Agreement and Custodian Agreement has previously received delivery of the Assignment of GNMA Securities, assigning all legal right, title and interest, in and to, the GNMA Securities described in Exhibit "A" attached and incorporated herein by reference, collectively referred to herein as the "GNMA Assets".[sic]

In addition, this Law Firm has received confirmation and verification that the GNMA Assets were not purchased on margin, are not subject to any liens or encumbrances, and that L.C.E. Inc., is now holder in due course of the GNMA Assets.

The Law Firm has been advised that L.C.E. International Inc. has transferred its interest in the GNMA Assets to its wholly owned subsidiary, .N.P. Inc. [sic], which has in turn, granted a security interest in the GNMA Assets to the Trust Company of Louisiana and has filed the UCC-1 Financing Statements attached hereto as Exhibit "B" recording the secured interest of the Trust Company of Louisiana.

The Law Firm as Custodian will maintain the GNMA Assets in it's [sic] Vault Depository Account and pursuant to the irrevocable instructions of Mr. Larry Leal on behalf of L.C.E. International, Inc. and N.N.P., Inc. and the UCC-1 Financing Statements, the Law Firm as Custodian has recorded by book entry in its books and records, the secured interest of the Trust Company of Louisiana in the GNMA Assets.

Henceforth, the Law Firm will not allow the GNMA Assets to be assigned, hypothecated, sold or transferred until the Law Firm as Custodian receives from the Trust Company of Louisiana, either a written release of the secured interest or written instructions as to the directed disposition of the GNMA Assets pursuant to a default under the agreements and documents which are the subject of the secured interest.

Should you have any questions, please do not hesitate to contact Robert Wyshak at the Trust Services Department of the Palm Springs Office.

Yours truly,

7

LAW OFFICES OF ROBERT H. WYSHAK & ASSOCIATES, LTD.
[Signature]

Jamieson testified that Wyshak agreed to send the letter to TCL conditionally on receipt of a custodial fee of $35,000. On the following day, January 31, 1991, Leal faxed to Wyshak and Eggleston a photocopy of a cashier's check in the amount of $35,000 made out to Prudential Bache Securities and deposited in Fidelity Asset Management's account. The check noted that it was for Wyshak's custodial fee. In April, May, and June 1991, NNP failed to make the required monthly interest payments on both notes. On July 1, 1991, TCL notified NNP and LCE of NNP's default. TCL instructed Wyshak to sell the GNMAs pursuant to the security agreement, and Wyshak then informed TCL that he did not hold the GNMAs. TCL filed suit in August, 1991.

In its Memorandum Ruling and Judgment filed February 23, 1995, the district court specifically found that Wyshak and Eggleston were not credible. The court found that Wyshak and Eggleston had drafted deliberately misleading documents implying that the "assets" in the law firm's custody were GNMAs rather than assignments of GNMAs. The court also found that other documents created the appearance that Wyshak and Eggleston and the firm had been duly diligent in verifying the existence and pedigree of the GNMAs when in fact Wyshak had neither the GNMAs nor the assignments of them, nor did he even know how to perfect such an assignment. The court found that Wyshak and Eggleston were liable under Federal Securities law and Louisiana Securities Law for the damages done to TCL. The court also found that they were liable under Louisiana Civil Code art. 1953 (fraud), and that they were liable for negligent misrepresentation, breach of contract, and breach of fiduciary duty under Louisiana law.

8

Wyshak, Wyshak & Associates, and Eggleston gave notice of appeal from the district court's Memorandum Ruling and Judgment, as well as from the grant of costs and fees that the court subsequently granted to TCI. Eggleston's brief was stricken for failure to comply with Local Rule 28, and his appeal was dismissed for failure to prosecute pursuant to Local Fifth Circuit Rule 42.3.3.

## DISCUSSION

Standard of Review

Findings of fact are reviewed under a clearly erroneous standard, and conclusions of law are viewed de novo. Fiberlok, Inc., v. LMS Enterprises, Inc., 976 F.2d 958, 962 (5th Cir. 1992). Deference is given to the district court's assessment of the credibility of witnesses and a finding of fact in that regard will not be overturned unless manifest error appears in the record. Real Asset Management, Inc., v. Lloyd's of London, 61 F.3d 1223 (5th Cir. 1995).

Issues on Appeal

While Wyshak listed ten issues, he discusses only four of them in the corpus of his brief, arguing that the 50 page limit of Local Rule 28 did not allow him room to brief the other issues. At the outset it must be noted that Wyshak's presentation of the facts of his case takes up fully half of his allotted page limit. Had he shortened his discussion of the facts, he would have had substantially more space to brief his arguments. "The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor. . . . " Fed. R. App. P. 28(a)(6). Pursuant to Rule 28, this court has found that contentions not briefed are waived and will not be considered on appeal." Zeno v. Great Atlantic & Pacific Tea Co., 803 F.2d 178, 180 (5th Cir. 1986). Thus, the only issues that have been considered on appeal are those that were actually briefed.

The Notice of Appeal

9

We first determine whether Wyshak has properly preserved on appeal the issues of improper service of process and personal jurisdiction. TCL asserts that because Wyshak did not specifically state in his notice of appeal that he was appealing the district court's judgment on the questions of service of process and personal jurisdiction, Wyshak is precluded from raising that issue here. We disagree.

Federal Rule of Appellate Procedure 3(c) provides in part: ". . . A notice of appeal . . . must designate the judgment, order, or part thereof appealed from . . . ." (Emphasis added.) We have held that where a party designates in the notice of appeal particular orders only (and not the final judgment), we are without jurisdiction to hear challenges to other rulings or orders not specified in the notice of appeal. See Warfield v. Fidelity & Deposit Co., 904 F.2d 322, 325-26 (5th Cir. 1990). But we have not applied this "specify-all-orders" approach to notices of appeal from a final judgment. Rather, we have held that an appeal from a final judgment sufficiently preserves all prior orders intertwined with the final judgment. In Cates v. International Tel. & Tel. Corp., 756 F.2d 1161, 1173 n.18 (5th Cir. 1985), we rejected the claim that a failure to specify all orders in a notice of appeal (which specified the final judgment as the order from which the party sought to appeal) precluded the appellant from challenging earlier orders. Id. We reasoned as follows::

> We think it evident Cates intended to appeal the entire case, and it has been briefed on that basis. The February 1983 order was the final order of the district court disposing of the lawsuit, it expressly was predicated on the April and October 1982 orders, and the several orders and the issues they deal with are for the most part inextricably interrelated. [Citations.]

Id. On two subsequent occasions, we have cited with approval this language from Cates. See Trust Co. Bank v. United States Gypsum Co., 950 F.2d 1144, 1148 (5th Cir. 1992); Federal Trade

10

Comm'n v. Hughes, 891 F.2d 589, 590 n.1 (5th Cir. 1990) (per curiam) (dictum); see also McLaurin v. Fischer, 768 F.2d 98, 101 (6th Cir. 1985).

This case comes within the Cates framework.[1] First, Wyshak's notice of appeal specifies the February 23, 1995 "Memorandum Ruling and Judgment," which the parties agree is the final judgment in the case. Second, the final judgment was predicated on the district court's decision that Wyshak was properly served with the complaints and that the court could therefore properly exercise personal jurisdiction over him. Indeed, if the district court erred in concluding that it could exercise personal jurisdiction over Wyshak, the final judgment would be invalid. See Broadcast Music, Inc. v. M.T.S. Enters., 811 F.2d 278, 281 (5th Cir. 1987).

Moreover, we have also suggested that if a party mistakenly designates the ruling from which he seeks to appeal, the notice of appeal is liberally construed and a jurisdictional defect will not be found if (1) there is a manifest intent to appeal the unmentioned ruling or (2) failure to designate the order does not mislead or prejudice the other party. See NCNB Texas Nat'l Bank v. Johnson, 11 F.3d 1260, 1269 (5th Cir. 1994); Turnbull v. United States, 929 F.2d 173, 177 (5th Cir. 1993); C.A. Marine Supply Co. v. Brunswick Corp., 649 F.2d 1049, 1056 (5th Cir.), cert. denied, 454 U.S. 1125 (1981).

In United States v. Lopez-Escobar, 920 F.2d 1241, 1244-45 (5th Cir. 1991), we stated that if both parties briefed the issue that allegedly was not preserved on appeal—as is the case here—and if the opposing party suffers no prejudice, we have jurisdiction to hear challenges to the unenumerated orders. In this case, both parties fully briefed the service of process/personal

---

[1]We express no opinion on whether the factors discussed in Cates (and those discussed here) serve as the only factors, or as necessary factors, for determining whether a party has intended to appeal all orders which form the basis of a final judgment.

11

jurisdiction issues, and there is no indication that the plaintiffs are in any way prejudiced by an appeal on those issues.

We conclude that the issues of improper service of process and lack of personal jurisdiction are properly before us.

Insufficiency of Service of Process and Personal Jurisdiction

We now turn to Wyshak's contention that the district court's judgment should be vacated because the district court did not have personal jurisdiction over him. Wyshak makes two arguments. Wyshak first argues that the district court could not exercise in personam jurisdiction over him because he was served with the original complaint while testifying in Louisiana pursuant to a grand jury subpoena. Under such circumstances, Wyshak claims, he is immune from service of process. Second, Wyshak contends that service of the first and second amended complaints was improper because no summons issued naming Wyshak. We reject both contentions.

Wyshak's first claim is moot because it is undisputed that the trial in this matter proceeded on the basis of the first and second amended complaints, not the original complaint. "A court which lacks personal jurisdiction over a defendant cannot enter a valid judgment against that defendant." Broadcast Music, Inc. v. M.T.S. Enters., 811 F.2d at 281. Because the judgment entered against Wyshak did not flow from the original complaint, any defect in personal jurisdiction does not cast a shadow on the court's entry of judgment against Wyshak. The basis for the district court's jurisdiction is found in the amended complaints. The amended complaints asserted claims under the Securities Exchange Act of 1934 (the Act), which provides for nationwide service of process. See

12

15 U.S.C. § 78aa.[2]  As such, the district court could properly exercise personal jurisdiction over Wyshak if he had sufficient contacts with the United States, which he indisputably had.  See Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan, 97 F.3d 822, 825-26 (5th Cir. 1996); Busch v. Buchman, Buchman & O'Brien, 11 F.3d 1255, 1258 (5th Cir. 1994).

We reject Wyshak's second argument on the ground that he waived his right to appeal the alleged nonissuance of a summons for the amended complaints.  Rule 12(h)(1) of the Federal Rules of Civil Procedure states in part the following:  "A defense of . . . insufficiency of service of process is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course."  Thus, to preserve his claim that service of the amended complaints was defective due to nonissuance of a summons, Wyshak was required to meet the requirements of Rule 12.  He failed to do so.

Our decision in Broadcast Music, Inc. v. M.T.S. Enters., 811 F.2d 278, is illustrative.  There, the appellants argued for the first time on appeal that the default judgment entered against them was void for lack of personal jurisdiction.  Although the appellants contended on appeal that they were not properly served, they nonetheless participated in some of the trial court proceedings.  We rejected the appellants' eleventh-hour contention that the district court lacked personal jurisdiction, reasoning that "[t]he Federal Rules do not in any way suggest that a defendant may halfway appear in a case, giving plaintiff and the court the impression that he has been served, and, at the appropriate time, pull failure of service out of the hat like a rabbit in order to escape default judgment."  Id. at 281.

---

[2]Section 78aa provides in part:  "Any suit or action to enforce any liability or duty created by this title . . . may be brought in any such district . . . and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

We find that the reasoning in <u>Broadcast Music</u> applies with equal force here. Wyshak participated in the entire trial, yet nothing in the record suggests that Wyshak raised the issue of nonissuance of a summons in the district court. In fact, as to the amended complaints, Wyshak never objected to the sufficiency of service of process until his motion for rehearing before this Court. We therefore conclude that Wyshak has waived any objection to the sufficiency of service of process of the amended complaints.

Misrepresentation

Wyshak argues that his law firm owed no duty to TCL under the laws of either Louisiana or California. He asserts that he and his firm were not part of the conspiracy to defraud promulgated by other defendants, that they did not make any representations whatsoever to TCL prior to funding, and that his letter to TCL did not constitute a legal opinion as to the proper method of perfecting a security interest in GNMAs.

Under Louisiana law, the elements of a claim for negligent misrepresentation are: (1) the existence of a legal duty on the part of the defendant to supply correct information or to refrain from supplying incorrect information; (2) breach of that duty, and (3) damages caused to the plaintiff as a result of that breach. <u>Barrie v. V.P. Exterminators</u>, 625 So. 2d 1007, 1015 (La. 1993). In order for an attorney to have a legal duty to supply correct information so that he is liable to a non-client for malpractice, the plaintiff must show that the attorney provided legal services and that the attorney knew that the third party intended to rely upon those legal services. <u>Abell v. Potomac Ins. Co.</u>, 858 F.2d 1104, 1133 (5th Cir. 1988), <u>vacated on other grounds</u>, 492 U.S. 914, 109 S. Ct. 3236, 106 L. Ed. 2d 584 (1989); <u>Capital Bank & Trust Co. v. Core</u>, 343 So. 2d 284, 288 (La.Ct. App. 1st Cir.), <u>writ not considered</u>, 345 So. 2d 61 (La. 1977), <u>writ refused</u>, 345 So. 2d 504 (La. 1977). An

14

attorney's liability to a third party flows from the codal provision that establishes liability for a stipulation pour autrui[3] pursuant to which one may bind himself to a contract for the benefit of a third party. See Abell, 858 F.2d at 1132. Where an attorney contracts to provide a professional opinion for the benefit of a third person, privity of contract results, and the agreement becomes binding and effective in favor of the third party upon his acceptance. Id.

In Capital Bank, Core, an attorney, issued Capital a title opinion covering the property described in a collateral mortgage, knowing that Capital would rely thereon in making a loan to Core's client. Core's title opinion certified his examination of title, asserting that the property was free of all encumbrances save the collateral mortgage to Capital despite Core's knowledge that the property was burdened with severe defects and encumbrances. See Capital Bank, 343 So. 2d at 287-88.

Similarly, LCE (Reliance) contracted with Wyshak to provide custodial services for its clients. Wyshak was aware that TCL expected him to act as custodian of the GNMAs themselves, and at no time did he take any action to disabuse TCL of this belief. In his letter to TCL, Wyshak acknowledged his agreement with LCE, and acknowledged his obligations to TCL: "Henceforth, the Law Firm will not allow the GNMA Assets to be assigned, hypothecated, sold or transferred until the Law Firm as Custodian receives from the Trust Company of Louisiana, either a written release . . . or written instructions. . . . " This same paragraph, along with the correspondence between

---

[3]A contracting party may stipulate a benefit for a third person called a third party beneficiary, and once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract without the beneficiary's agreement. LA. CIV. CODE art. 1978. Such a contract is known as a third party beneficiary contract, or a stipulation pour autrui. The stipulation gives the third party beneficiary as well as the stipulator the right to demand performance from the promisor. LA. CIV. CODE art. 1981.

15

Eggleston, Wyshak and Reliance, clearly demonstrates that Wyshak knew that TCL was relying on that information. Thus Wyshak had a legal duty to TCL as third party beneficiary to refrain from supplying incorrect information. Furthermore, Wyshak breached that duty in misrepresenting that he had custody of the GNMA securities and their assignments, and in misrepresenting that LCE had an ownership interest in the GNMAs. That breach caused TCL substantial damages when it had to reimburse all of the ERISA funds that it had invested in the scheme. Thus, TCL established that Wyshak was liable for negligent misrepresentation under Louisiana law.

Based on the foregoing factual scenario, the trial court similarly concluded that Wyshak was liable under Louisiana law for fraud, LA. CIV. CODE art. 1953, and breach of contract, LA. CIV. CODE art. 1997, and fraud under Louisiana Securities Laws, LA. REV. STAT. §51:714A. The trial court further found that Wyshak was liable for breach of fiduciary duty, citing Gerdes v. Estate of Cush, 953 F.2d 201, 204 (5th Cir. 1992); Plaquemines Parish Commission Council v. Delta Development Co., Inc., 502 So. 2d 1034, 1040 (La. 1987). Because we find that Wyshak was liable for negligent misrepresentation, we will not elaborate on the other findings of liability under state law. Our review of the record convinces us to affirm these findings for essentially the reasons outlined by the trial court in its memorandum opinion.

Federal Securities Law

The pertinent rule of the Securities Exchange Act provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,'(a) To employ any device, scheme or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the

16

light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §240.10b-5 ("Section 10b-5").  The elements of a Section 10b-5 civil liability claim are well established:  The plaintiff must prove (1) a misstatement or omission (2) of material fact (3) occurring in connection with the purchase or sale of a security, that (4) was made with scienter and (5) upon which the plaintiff justifiably relied, (6) and that proximately caused injury to the plaintiff. Rubenstein v. Collins, 20 F.3d 160, 166 (5th Cir. 1994).

Wyshak argues that he should not have been found liable under federal securities law because (1) the notes given as security for the funds advanced by TCL were not "securities"; (2) only a "purchaser" or "seller" of a security may assert a claim under the federal rule and TCL was neither; (3) neither he nor Eggleston made any representations to TCL in connection with the transaction, so TCL could not have justifiably relied on any; (4) Wyshak, Eggleston, and his firm had no "scienter" that the GNMAs were not authentic; and (5) while Wyshak, Eggleston, and his firm's conduct may have abetted a fraudulent scheme, they should not be held liable under 10(b)-5 because their actions did not amount to knowing or intentional misconduct.

To determine whether a note is a security within the meaning of the Securities Acts, the Supreme Court has established the "family resemblance" test. Reves v. Ernst & Young, 494 U.S. 56, 65-67, 110 S. Ct. 945, L. Ed. 2d 47 (1990).  A note is presumed to be a "security," and that presumption may be preliminarily rebutted by a showing that it more closely resembles the "family" of instruments found not to be securities. Reves, 494 U.S. at 67.  That family includes

17

the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business.

Reves, 494 U.S. at 65.   Then, if the instrument is not sufficiently similar to an item on the family resemblance list, four factors are examined to determine whether the instrument at issue is in another category that should be added to the list of non-securities.  Reves, 494 U.S. at 67.

The four factors consider attributes common to most securities.  First, the transaction is examined to assess whether the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate.  Reves, 494 U.S. at 66.  If this is the case, then the instrument is likely to be a "security."  Id.  Second, the "plan of distribution" of the instrument is examined to determine whether it involves "common trading for speculation or investment."  Id.  Third, the reasonable expectations of the investing public are considered.  Id.  Finally, a court must examine whether some other factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.  Reves, 494 U.S. at 67.

Applying the family resemblance approach to this case, we have little difficulty in concluding that the TCL notes at issue are  "securities."  The notes do not closely resemble any of the family resemblance examples.  Nor does an examination of the four factors suggest that the notes are not securities.  LCE's purported purpose in selling the notes was to raise money for the general use of a nonexistent long distance phone company and TCL's purpose in purchasing them was the 16%

18

return promised. Though the notes were made out to TCL, those notes were funded by TCL's ERISA plan customers, thus there existed a plan of distribution. The fact that there was no public distribution is not fatal to TCL's securities laws claims. A debt instrument may be distributed to but one investor, yet still be a security. National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc., 768 F. Supp. 1010, 1015-16 (S.D. N.Y. 1991)(citations omitted). Any other interpretation of Reves would contradict Congress's intent to enact a definition of "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment. National Bank, 768 F. Supp. at 1016, citing Reves, 494 U.S. at 61.

Looking to the third Reves factor, an investor would reasonably view the obligations as securities, and would expect that investors such as the ERISA plans at issue might invest in promissory notes issued to capitalize a business, and secured by GNMAs. Thus, the NNP transactions were investment instruments, not consumer or commercial bank loans or financing. Finally, there exists no other regulatory scheme that might significantly reduce the risk that such an investment would be secured by non-existent GNMA's.

In addition to arguing that the NNP notes were not "securities," Wyshak also argues that TCL was not a " purchaser" of a security entitled to the protections of Section 10b-5. Because a purchase includes "any contract to buy, purchase or otherwise acquire" a security, 15 U.S.C. §78c(a)(13), obtaining funds secured by a pledge of securities qualifies as a purchase. Rubin v. United States, 449 U.S. 424, 429, 101 S. Ct. 698, 66 L. Ed. 633 (1981). If obtaining funds secured by a pledge of securities qualifies as a purchase, certainly obtaining funds secured by a pledge of a GNMA or an interest in a GNMA also qualifies.

19

As with Wyshak's argument that the notes were not securities and the transaction was not a purchase of a security, Wyshak's argument that he did not know the transaction was not properly collateralized must also be rejected. To establish that a defendant had the requisite scienter and knowingly made material misrepresentations, a Section 10b-5 plaintiff must establish that the defendant intended to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). Strict intentional misconduct is not required to show scienter, it is sufficient to prove conduct that is an extreme departure from the standards of ordinary care and presents a danger of misleading buyers or sellers, as well as either knowledge of that danger, or a danger so obvious that the actor must be aware of it. Warren v. Reserve Fund, Inc., 728 F.2d 741, 745 (5th Cir. 1984). Analysis of scienter requires an examination of defendant's conduct, not a mere assertion of plaintiff's confused mind. Warren, 728 F.2d at 745. Wyshak and Eggleston knew at all times that they did not hold the actual GNMAs. Moreover, Wyshak and Eggleston must at the very least have suspected that the formulators of the scheme did not really own the GNMAs in question from their experiences with the FBI and the Utah Insurance Commission. Wyshak even sent a letter accusing Reliance of fraud, yet he turned around and assured TCL that his firm was indeed the custodian for the GNMA "assets." Thus, as the trial court found, Wyshak intentionally misrepresented the situation to TCL by failing to disclose that he did not have the GNMAs.

For the purposes of the securities laws, an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976). The standard for

20

misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor. Laird v. Integrated Resources, Inc., 897 F.2d 826, 832 (5th Cir. 1990). The scope of this standard is determined by the relative status and sophistication of the parties. Id. As the trial court found, Wyshak's misrepresentations were material. Wyshak was presented as a Harvard-educated attorney and former Assistant U.S. Attorney, thus it was reasonable that TCL would be misled by Wyshak's misrepresentations.

Wyshak also argues that TCL's reliance on his custodianship was not justifiable, and that TCL had not performed any semblance of a due diligence examination prior to investing. Wyshak argues that TCL failed to underwrite the NNP transactions, neglected to obtain readily available information on the identity of the borrower, the repayment structure, and failed to obtain financial and credit information. He points out that TCL failed to demand possession of the GNMA certificates or the PD-1832 Assignments, and failed to verify ownership through Chemical Bank before committing funds.

Due diligence is a separate element of a private cause of action for violation of Rule 10b-5. The standard for due diligence is "whether the plaintiff has 'intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. Laird, 897 F.2d at 837. Nevertheless, because the federal policy of deterring intentional misconduct in securities dealings outweighs the policy of deterring negligent behavior by investors, a plaintiff should not be held to a standard stricter than recklessness. See Dupuy v. Dupuy, 551 F.2d 1005, 1019-20 (5th Cir. 1977), cert. denied, 434 U.S. 911, 98 S. Ct. 312, 54 L. Ed. 2d 197 (1978). A number of factors may be used to gauge whether a plaintiff's conduct indicates a lack of due diligence amounting to recklessness so as to bar

recovery. Id. The trial court found that TCL relied on its trust officer, James Crank and its attorneys, Johnson & Gibbs to properly authenticate its potential investments. That TCL's reliance may have been misplaced does not mean that it was reckless with regard to its investment, and the federal policy of deterring misconduct such as Wyshak's outweighs the policy of encouraging investors such as TCL to be more stringent in investigating their trust officers' and attorneys' advice. In sum, Wyshak's argument that he should not have been found liable under Section 10b-5 is rejected because TCL has established all elements of the claim. Wyshak and Eggleston knowingly and with scienter made material misstatements in connection with the purchase of a security. TCL justifiably relied on those material misstatements and that reliance proximately caused injury to TCL.

Recusal

Finally, Wyshak argues that the trial court should have been recused under 28 U.S.C. §445(a) because of an ex parte communication with an unnamed FBI agent.

Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. 28 U.S.C. §455(a). In order to determine whether a court's impartiality is reasonably in question, the objective inquiry is whether a well-informed, thoughtful and objective observer would question the court's impartiality. United States v. Jordan, 49 F.3d 152 , 155-58 (5th Cir. 1995 ). Apparently, the court disclosed prior to the start of the trial that it had a conversation via telephone with an unnamed FBI agent. Even if, as Wyshak claims, the agent revealed information regarding the case in the course of that conversation, Wyshak nowhere alleges what that information was which could have influenced the court's decision, nor does he allege that the verdict was based on that information.

22

Wyshak further alleges that the court demonstrated bias when it denied Wyshak's motion to continue the trial due to his illness, refused to permit Wyshak's objections to exhibits and depositions, overruled Wyshak's and Eggleston's objections to testimony, and concluded that neither Wyshak nor Eggleston were credible.

Contrary to Wyshak's assertions, the acts of which Wyshak complains were merely routine trial administration efforts and ordinary admonishments, and do not display any deep-seated antagonism. The court decided against a continuance because Wyshak's difficulties in obeying the court's rules had already substantially delayed trial; nevertheless, in recognition of Wyshak's physical condition, the court allowed Wyshak to sit while addressing the court and interviewing witnesses, and allowed him to take breaks whenever requested. Despite Wyshak's failure to follow the court's scheduling order, the court allowed Wyshak to file findings of fact and conclusions of law on the date of the trial and allowed Wyshak to have a continuing objection.

In conclusion, the district court's impartiality could not reasonably be questioned, and the district court's judgment that Wyshak and Robert H. Wyshak & Associates are liable to TCL for damages under Louisiana law and for securities fraud under 17 C.F.R. §240.10b-5 is AFFIRMED.

23